## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CAP-XX, LTD., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 19-1733-CFC-JLH |
| | ) | |
| MAXWELL TECHNOLOGIES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## JOINT CLAIM CONSTRUCTION BRIEF

Philip A. Rovner (#3215)
Jonathan A. Choa (#5319)
POTTER ANDERSON & CORROON
LLP
Hercules Plaza
P.O. Box 951
Wilmington, DE 19899
(302) 984-6000
provner@potteranderson.com
jchoa@potteranderson.com

Jack B. Blumenfeld (#1014)
Jeremy A. Tigan (#5239)
MORRIS, NICHOLS, ARSHT
& TUNNELL LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@morrisnichols.com
jtigan@morrisnichols.com

OF COUNSEL:

Chris P. Perque
Adam K. Yowell
Jason P. Mueller
FISHER BROYLES LLP
2925 Richmond Ave, Ste. 1200
Houston, TX 77098
(832) 604-4417

*Attorneys for Plaintiff CAP-XX, Ltd.*

OF COUNSEL:

Heidi L. Keefe
Lam Nguyen
COOLEY LLP
3175 Hanover Street
Palo Alto, CA 94304-1130
(650) 843-5000

Adam M. Pivovar
Elizabeth Shrieves
COOLEY LLP
1299 Pennsylvania Avenue, NW,
Suite 700
Washington, DC 20004
(202) 842-7800

Erik Milch
Jennifer Volk-Fortier
COOLEY LLP
One Freedom Square
Reston Town Center
11951 Freedom Drive
Reston, VA 20190
(703) 456-8000

Dated: October 8, 2021

*Attorneys for Defendant*
*Maxwell Technologies, Inc.*

# <u>TABLE OF CONTENTS</u>

**Page**

I.    CAP-XX INTRODUCTION AND BACKGROUND ....................................1

II.   MAXWELL INTRODUCTION AND BACKGROUND ............................6

III.  CAP-XX STATEMENT OF APPLICABLE LAW ....................................10

IV.   MAXWELL STATEMENT OF APPLICABLE LAW ...............................11

V.    AGREED UPON CONSTRUCTIONS ...................................................12

VI.   DISPUTED CONSTRUCTIONS........................................................13

    A.   **"Electrode(s)"** ..........................................................13

        *1.    Plaintiff's Opening Position* ...................................13

        *2.    Defendant's Answering Position* .............................15

        *3.    Plaintiff's Reply Position* ........................................20

        *4.    Defendant's Sur-Reply Position*................................22

    B.   **"Electrolyte"** ............................................................24

        *1.    Plaintiff's Opening Position* ...................................24

        *2.    Defendant's Answering Position* .............................25

        *3.    Plaintiff's Reply Position* ........................................28

        *4.    Defendant's Sur-Reply Position*................................33

    C.   **"Sealed Package"**......................................................34

        *1.    Plaintiff's Opening Position* ...................................35

        *2.    Defendant's Answering Position* .............................36

        *3.    Plaintiff's Reply Position* ........................................39

        *4.    Defendant's Sur-Reply Position*................................41

**D.**    **Maximum Operating Voltage of The Cell/The Device** .................43

    *1.*    *Plaintiff's Opening Position* ....................................44

    *2.*    *Defendant's Answering Position* .............................46

    *3.*    *Plaintiff's Reply Position* .......................................51

    *4.*    *Defendant's Sur-Reply Position* ..............................55

**E.**    **"Charge Storage Cell"** ....................................................59

    *1.*    *Plaintiff's Opening Position* ....................................60

    *2.*    *Defendant's Answering Position* .............................61

    *3.*    *Plaintiff's Reply Position* .......................................65

    *4.*    *Defendant's Sur-Reply Position* ..............................66

**F.**    **"Charge Storage Device/Device"** .................................69

    *1.*    *Plaintiff's Opening Position* ....................................70

    *2.*    *Defendant's Answering Position* .............................71

    *3.*    *Plaintiff's Reply Position* .......................................75

    *4.*    *Defendant's Sur-Reply Position* ..............................79

**G.**    **"Figure of Merit"** .........................................................80

    *1.*    *Plaintiff's Opening Position* ....................................81

    *2.*    *Defendant's Answering Position* .............................82

    *3.*    *Plaintiff's Reply Position* .......................................84

    *4.*    *Defendant's Sur-Reply Position* ..............................84

# TABLE OF AUTHORITIES

**CASES**

**Page(s)**

*Amgen Inc. v. Amneal Pharms. LLC*,
  945 F.3d 1368 (Fed. Cir. 2020) ..........................................................................74

*Bd. of Regents of the Univ. of Tex. Sys. v. A123 Sys., Inc.*,
  No. 3:06-cv-1655, 2011 WL 1135115 (N.D. Tex. Mar. 29, 2011) ...................85

*Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*,
  262 F.3d 1258 (Fed. Cir. 2001) ..........................................................................32

*Bio-Rad Labs., Inc. v. Int'l Trade Comm'n*,
  998 F.3d 1320 (Fed. Cir. 2021) ..........................................................................62

*CAP-XX v. Ioxus, Inc.*,
  C.A. No. 18- 849.......................................................................................... 1-3, 45

*Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*,
  289 F.3d 801 (Fed. Cir. 2002) .....................................................................passim

*Control Res., Inc. v. Delta Elecs., Inc.*,
  133 F. Supp. 2d 121 (D. Mass. 2001).................................................................82

*Cook Biotech Inc. v. ACell, Inc.*,
  460 F.3d 1365 (Fed. Cir. 2006) ..........................................................................83

*Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*,
  800 F.3d 1375 (Fed. Cir. 2015) ............................................................................6

*In re Packard*,
  751 F.3d 1307 ......................................................................................................72

*Mondis Tech. Ltd. v. LG Elecs., Inc.*,
  C.A. No. 15-4431 (SRC), 2017 U.S. Dist. LEXIS 163884 (D.N.J. 2017).........76

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) (en banc) ...................................................11, 20

*Pitney Bowes, Inc. v. Hewlett-Packard Co.*,
  182 F.3d 1298 (Fed. Cir. 1999) ............................................................... 11-12, 70

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,
    904 F.3d 965 (Fed. Cir. 2018) ....................................................... 30

*Sentient Sensors, LLC v. Cypress Semiconductor Corp.*,
    No. 19-1868 (MN), 2021 U.S. Dist. LEXIS 93222 (D. Del. 2021) .................. 78

*Shoes by Firebug LLC v. Stride Rite Children's Grp., LLC*,
    962 F.3d 1362 (Fed. Cir. 2020) ..................................... 12, 72, 76, 79

*SRI Int'l v. Matsushita Elec. Corp. of Am.*,
    775 F.2d 1107 (Fed. Cir. 1985) (en banc) ........................................ 20

*Starhome GmbH v. AT&T Mobility LLC*,
    743 F.3d 849 (Fed. Cir. 2014) ................................................... 12

*Tandon Corp. v United States Int'l Trade Comm'n*,
    831 F.2d 1017 (Fed. Cir. 1987) .................................................. 38

*Thorner v. Sony Comput. Ent. Am. LLC*,
    669 F.3d 1362 (Fed. Cir. 2012) .................................................. 23

*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996) ................................................... 12

## OTHER AUTHORITIES

*Authoritative Dictionary of IEEE Standards Terms* (7th ed. 2000) ................. 16, 25

https://www.merriam-webster.com/dictionary/device ............................. 75

Rudolf F. Graf, The Modern Dictionary of Electronics ........................... 44

Wikipedia, The Free Encyclopedia – Figure of Merit, *available at*
    https://en.wikipedia.org/wiki/Figure_of_merit ............................... 83

Wiley Electrical and Electronics Engineering Dictionary ...................... 16, 21

# I.     CAP-XX INTRODUCTION AND BACKGROUND

Plaintiff CAP-XX, Ltd. ("CAP-XX") filed suit against Defendant Maxwell Technologies, Inc. ("Maxwell") on September 16, 2019 asserting infringement of U.S. Patent No. 6,920,034 ("the '034 patent") and U.S. Patent No. 7,382,600 ("the '600 patent") (D.I. 1) (collectively, the "patents-in-suit") (Exhs. A and B).  About two months thereafter, on November 18, 2019, this Court construed several claim terms of the patents-in-suit in a related case, *CAP-XX v. Ioxus, Inc.*, C.A. No. 18-849, *Ioxus* D.I. 66 ("the *Ioxus* case").  Exh. C, hereto.  In this instance, the dispute involves about six claim terms, and for some of them, Maxwell disputes this Court's construction in the *Ioxus* case.  The patents-in-suit have essentially the same specification, except for the claims and references to related patent applications therein.  For the sake of brevity, this brief cites only to the specification of the '034 patent; however, those citations apply equally to the '600 patent.

CAP-XX is an Australian company that makes supercapacitors sold in the U.S. and elsewhere in competition with Maxwell.[1]  The earliest application filing date for the patents-in-suit is December 5, 1998.  Prior to that time, the named

---

[1]The term supercapacitor is not limiting, as it encompasses storage devices referred to as ultracapacitors, electrochemical capacitors, and electric double layer capacitors, among others. Exh. A, the '034 patent, 1:11-20. In addition, the patents-in-suit are also not limited to a particular outer-construction, as it discloses cylindrical devices and others in flat packaging (i.e., "prismatic" capacitors), as shown in the '034 patent, Figures 1-11, 18-19, and 21-25.

inventors on the patents-in-suit discovered several improvements on capacitors that enhanced their physical characteristics making them more suitable for applications requiring high pulse power, like starting an engine or powering the flash for a camera on a mobile phone. Thereby, a capacitor with CAP-XX's patented improvements may be used in those applications, in lieu of a conventional battery or other types of capacitors.[2] Hence, while capacitors were generally known before December 1998, the improvements set forth in the patents-in-suit produced demonstrably better physical properties for certain type of capacitors, as explained further below, which enhanced their effectiveness and ability to replace other charge storage devices, like batteries, in such applications.

The patents-in-suit disclose an improved charge storage device—namely, a supercapacitor, with lower impedance and higher power density. Exh. A, the '034 patent, 1:11-20. Before December 1998, supercapacitors generally fell into two groups: devices for high or low power applications. *Id.* at 1:48-51. The named inventors on the patents-in-suit improved upon existing technology by developing supercapacitors with the desired high-power characteristics, while reducing various resistive components of such devices. The improvements described in the patents-in-suit include: (i) improving the connection between the terminals and electrodes;

---

[2] CAP-XX submits herewith a tutorial explaining technical terms and concepts related to capacitors referenced in the patents-in-suit. *See*, Exh. D, Plaintiff CAP-XX Ltd.'s Technology Tutorial.

(ii) reducing the resistance of the electrodes themselves through materials selection and minimizing the thickness; (iii) improving the interface between the electrode components, that is, the aluminum sheet or substrate and carbon materials applied thereto; (iv) improving the carbon inter-particle interface through the use of conducting and active carbon materials in certain ratios; (v) improving the interface between the electrolyte and the carbon layer; and (vi) improving the separator through the selection of materials having a certain thickness and porosity. *Id.* at 19:43-61; 21:48-22:11; 30:6-66. The cumulative significance of these improvements to supercapacitors is apparent from Fig. 17 of the patents-in-suit, a table showing the superior characteristics of test devices of CAP-XX supercapacitors in development at that time when, compared to experimental capacitors under development by others. *See* Exh. A, the '034 patent, Fig. 17.

For high power pulse applications, the patents-in-suit explain the importance of determining certain physical characteristics of a supercapacitor at a specific frequency. In that regard, the patents-in-suit explain that the "Figure of Merit" or FOM of a capacitor is the measurement of its power density (i.e., volumetric or gravimetric power density) at a certain frequency, where the impedance of the device reaches a -45 degree phase angle. Exh. A, the '034 patent, 16:42-62; *see also* Exh. D, Plaintiff's Technology Tutorial, slides 17-24. Thereby, FOM provides an empirical value of the power density, i.e., a physical characteristic, of a

supercapacitor operating at a certain frequency, a more accurate indication of the pulse power characteristics of that device, and a means for more accurately comparing those properties in various devices.

The asserted patent claims recite physical characteristics of a charge storage device (i.e., supercapacitor), including the power density thereof. For some claims, the power density of the device is represented by its Figure of Merit or FOM, and in other claims, it is represented by its power maximum or Pmax. Claims 13 and 34 of the '034 patent, shown below, are examples of asserted claims with the disputed claim terms bolded therein:

Claim 13. A **charge storage device** including:

a **charge storage cell** including:

(a) a first **electrode** having a first layer including a carbon having a surface area greater than 400 m$^2$/gram;

(b) a second **electrode** having a second layer including a carbon having a surface area greater than 400 m$^2$/gram; and

(c) a porous separator disposed between the **electrodes**;

a **sealed package for containing the cell and an organic electrolyte** in which **the cell** is immersed, wherein the first and second layers are opposed and spaced apart; and

at least two terminals that extend from the package to allow external electrical connection to the cell, wherein the volumetric **FOM (Figure of Merit)** of **the device** is greater than about 1.1 Watts/cm$^3$ and the **maximum operating voltage** of the cell is less than about 4 Volts.

Claim 34. A **charge storage device** including:

a **charge storage cell** having:

(a) a first **electrode**;

(b) a second **electrode** being opposed to and spaced apart from the first **electrode**; and

(c) a porous separator disposed between the **electrodes**;

a **sealed package for containing the cell and an electrolyte** in which **the cell** is immersed; and

at least two terminals that extend from the package to allow external electrical connection to **the cell**, wherein the volumetric power maximum of **the device** is greater than about 35 Watts/cm$^3$ and the **maximum operating voltage** of **the cell** is less than about 4 Volts.

Exh. A, the '034 patent, 31:63-32:14; 33:1-14 (emphasis added).

5

## II.    MAXWELL INTRODUCTION AND BACKGROUND

Plaintiff's arguments in support of its constructions are filled with errors, omissions, and inconsistencies.[3]  CAP-XX did not invent electrochemical capacitors. Nor do the asserted claims recite any new or novel materials that CAP-XX purportedly invented for use in an electrochemical capacitor.  Rather, the asserted claims generically recite structures and materials that were already known and in use in the prior art, such as the generic recitation of any "electrode(s)," "porous separator," and a "sealed package" for containing an "electrolyte" without limitation. (*See, e.g.*, Ex. F (Conway) at 107.)  These are all generic features common to *any* electrochemical capacitor that includes an electrolyte.  Indeed, the use of electrodes with carbon was pervasively known in the art and already employed in numerous commercial electrochemical capacitor devices long before the priority date of the asserted patents.[4]  (*See, e.g.*, Ex. F at 183-185.)

---

[3] CAP-XX's opening claim construction brief attaches what it identifies as a "technology tutorial."  There is nothing in the case schedule that requests or permits the filing of a technology tutorial as an adjunct to avoid the word limitations within the Court's scheduling order.  To the extent necessary, Maxwell will respond to CAP-XX's "technology tutorial" during the claim construction hearing.

[4] The presumptive priority date of the asserted patents is the earliest non-provisional filing date, which is December 6, 1999.  It is CAP-XX's burden to demonstrate that the full scope of the asserted claims has written description and enablement support to any application that pre-dates the filing date of the earliest non-provisional application.  *See Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1379 (Fed. Cir. 2015).  The parties' dispute concerning the priority date of asserted claims will not be addressed by Maxwell in the context of this claim construction briefing.

The specification and the claims indicate that the claimed inventions are meant to be extremely broad and all-encompassing with respect to the claimed "charge storage *device*." ('034 patent, 1:13-20.)  Indeed, although ambiguously referring to the claims as being directed to "supercapacitors," CAP-XX agrees that the claimed "charge storage *device(s)*" encompass devices referred to as "ultracapacitors, electrochemical capacitors, and electric double layer capacitors, *among others*."  (Page 1, n.1, *supra* (emphasis added); *see also* Ex. F at 13 ("The present preferred name . . . is now more scientific and generic, namely 'electrochemical capacitors.'").)  These claimed "devices" include electrochemical capacitors based on pseudocapacitance.  (*See* Ex. F at 105, 221-224.)

As such, the asserted claims essentially amount to pure functional claiming. They recite unbounded performance requirements in the form of a "gravimetric[/volumetric] FOM (Figure of Merit) of the device" or a "gravimetric[/volumetric] power maximum of the device" without reciting the actual specific materials necessary to allow a person of ordinary skill to recognize that the inventors possessed any and all such claimed inventions or to how to construct a device that would achieve the full scope of the unbounded performance that falls within the literal scope of the claims without undue experimentation.

For example, claim 1 of the '034 patent recites a generic "charge storage device" "wherein the volumetric FOM (Figure of Merit) of the device is ***greater***

*than* about 3.2 Watts/cm$^3$." This limitation literally includes any device above the recited threshold, such as devices that have a volumetric FOM of 50 Watts/cm$^3$, 100 Watts/cm$^3$, 1,000 Watts/cm$^3$, or even greater than 1,000 Watts/cm$^3$. By claiming any devices with these unbounded functional characteristics, CAP-XX will have to demonstrate that the specification of the patents-in-suit have written description and enablement for devices that include these exceptional functional characteristics that fall within the literal scope of the claims.

Additionally, it is undisputed that electrochemical capacitors operate under a broad range of temperatures[5] and that their performance with respect to the "gravimetric[/volumetric] FOM (Figure of Merit) of the device" and the

---

[5] For example, indicative of the broad operating temperatures for electrochemical capacitors, CAP-XX identifies certain of its products as having operating temperatures between -40 °C and +85 °C:



Ex. K, "CAP-XX Supercapacitors Product Guide," (2014) at 6, *available at* http://www.cap-xx.com/wp-content/uploads/2015/04/CAP-XX-Product-Guide-Web.pdf.

"gravimetric[/volumetric] power maximum of the device" vary tremendously within their broad operational temperatures. In fact, the "gravimetric[/volumetric] FOM (Figure of Merit) of the device" can vary by more than a factor of 30x across the typical operating temperatures of an electrochemical capacitor and the asserted patents and the parties' agreed upon construction for these functional performance terms allow for their determination at any temperature (i.e., no specific temperature is identified or required in the patents-in-suit for the determination of the FOM or power maximum). (*See, e.g.*, Ex. G, Miller paper, at 9 (Table II).) This renders the claims inherently indefinite, as a given device could ambiguously and simultaneously both satisfy and not satisfy the claims depending on the temperature at which capacitor was operating within its broad temperature window.[6]

The asserted claims further recite different structural terms that CAP-XX's opening brief simply ignores. Specifically, the claims differentiate between different structural terms recited as "[a] charge storage ***device***" / "the ***device***" and "a charge storage ***cell***" / "the ***cell***." (*See, e.g.*, '034 patent, cl. 1.) That is, the claimed "***device***" and the claimed "***cell***" are different and distinct terms within the recited claims. The

---

[6] Maxwell will set forth the indefiniteness of the claims based on this inherent ambiguity later in this case and in accordance with the Court's preferred timing of when such disputes should be resolved. Maxwell merely notes here that the parties' have agreed (i.e., it is not disputed as a matter of claim construction) that the terms "gravimetric[/volumetric] FOM (Figure of Merit) of the device" and the "gravimetric[/volumetric] power maximum of the device" are not in any way limited to determination at a specific or single temperature.

proper construction of these terms accounting for their differences is critical, in that the claims literally recite them as distinct and different terms and the claims further rely on those distinctions, such as on the one hand reciting "the maximum operating voltage *of the cell*" and on the other hand reciting "the maximum operating voltage *of the device*." (*Compare, e.g.*, '034 patent, cl. 1 and '600 patent, cl. 11 (emphasis added).) Maxwell's proposed constructions of various terms acknowledge the distinction between "device" and "cell," consistent with the recited claim language and specification, and therefore should be adopted.

Beyond the disputed terms differentiating between the "device" and the "cell," the remaining disputed terms are commonly used terms of art for which the patent applies the unmodified plain and ordinary meaning to a person of ordinary skill. Accordingly, terms such as "electrode" and "electrolyte" should be given their plain meaning, in accordance with their dictionary definitions, as Maxwell's proposed constructions follow and CAP-XX's do not.

## III.    CAP-XX STATEMENT OF APPLICABLE LAW

The words of a claim "are generally given their ordinary and customary meaning," which is "the meaning that the term would have to a person of ordinary skill in the art." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (*en banc*). Claim terms "must be read in view of the specification." *Id.* at 1315. And "the prosecution history can often inform the meaning of the claim language by

demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id.* at 1317.

Claim terms found only in the preamble of an asserted claim, as compared to the body of the claim, are subject to additional claim construction rules. In general, a claim term found only in the preamble limits the invention <u>only if</u> it recites essential structure or steps, or if it is necessary to give life, meaning, and vitality to the claim. *See Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002) (*quoting Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*, 868 F.2d 1251, 1257 (Fed. Cir. 1989)). A preamble is not limiting where a patentee defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use for the invention. *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1305 (Fed. Cir. 1999)).

## IV.    MAXWELL STATEMENT OF APPLICABLE LAW

Claim terms are construed by giving words of the claim the meaning they would have to one of ordinary skill in the art in view of the intrinsic record consisting of the claims, specification, and file history. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313-14 (Fed. Cir. 2005). "The starting point for any claim construction must be the claims themselves." *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1305 (Fed. Cir. 1999). After examining the claim language, the Court may then

consider the specification and prosecution history. *See Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). Extrinsic evidence, such as dictionary definitions and technical publications, that "does not contradict any definition found in or ascertained by a reading of the patent documents" may also be considered. *Starhome GmbH v. AT&T Mobility LLC*, 743 F.3d 849, 856 (Fed. Cir. 2014) (quoting *Phillips*, 415 F.3d at 1322-23).

Claim terms found within the preamble of a claim may limit the claimed invention when it provides antecedent basis for subsequent claims. *See, e.g., Shoes by Firebug LLC v. Stride Rite Children's Grp., LLC*, 962 F.3d 1362, 1368 (Fed. Cir. 2020). The preamble may also be limiting where it "recites essential structure or steps, or if it is 'necessary to give life, meaning, and vitality' to the claim." *Catalina Marketing Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002) (quoting *Pitney Bowes*, 182 F.3d at 1305).

## V.    AGREED UPON CONSTRUCTIONS

As shown in the Joint Claim Construction Chart, the parties agreed to the construction of the following claim terms: "gravimetric Figure of Merit of the device," "volumetric Figure of Merit of the device," "volumetric power maximum of the device," "gravimetric power maximum of the device," and "about." D.I. 59, pp. 5-6. They are essentially the same constructions as adopted by this Court's in the *Ioxus* case, except that Maxwell argues, as discussed below, that the Court should

further construe the term "Figure of Merit," notwithstanding the parties' agreed upon construction in the Joint Claim Construction Chart. Maxwell also disputes the construction adopted by this Court in the *Ioxus* case for the claim term "maximum operating voltage".

## VI.   DISPUTED CONSTRUCTIONS[7]

### A.   "Electrode(s)"

| Claim Term / Phrase | Claim Number(s) | Plaintiff's Proposed Construction and Supporting Intrinsic Evidence | Defendant's Proposed Construction and Supporting Intrinsic Evidence |
|---|---|---|---|
| "electrode(s)" | the '034 patent, cls. 1, 12, 13, 23, 32, 34, 40, 42, 51, and 61<br><br>'600 patent, cls. 1 and 3-7 | An electric conductor capable of storing a charge when voltage is applied to the cell.<br><br>*See e.g.,* the '034 patent, Abstract, Figs. 2-6, 11A, 18, 19, and 21; 2:7-20; 17:19-25; 21:64-67; 22:15-18; 22:46-48; and 28:11-20. | An electric conductor capable of storing and/or transferring charge.<br><br>*See e.g.,* the '034 patent 1:13-20; 2:7-20; 17:55-57; 23:39-44 |

### 1.   *Plaintiff's Opening Position*

The parties agree that the "electrode" is an electric conductor capable of storing a charge. CAP-XX disputes the "and/or" in Maxwell's proposed

---

[7] Maxwell does not believe that the order of claim terms herein is the order in which the claim terms should be argued or presented to the Court at the claim construction hearing. Maxwell believes that the order of the terms in this brief should follow the order from Maxwell's briefs. The parties will meet-and-confer on this issue.

construction, as it is superfluous and misleading.  By way of example, the electrodes are shown below highlighted in Fig. 21 of the patents-in-suit:



**FIGURE 21**

The '034 patent explains that electrodes 303 and 304 include tabs 309 for connecting to the terminals 305 and 306.  In addition, the electrodes include a coating 310 of high surface area carbon.  Exh. A, '034 patent, 31:63-32:14; 33:1-14.  The '034 patent explains that capacitors with carbon coated electrodes operate differently than electrodes in traditional capacitors and further explains that the charge build-up occurs on the surface of the carbon layer.  *Id.* at 21:58-22:18.  Hence, CAP-XX's proposed construction captures two aspects of the electrode: first, that it stores a charge and, second, that it is an "electric conductor," that is, it is capable of transferring a charge, as discussed above.

14

The "and/or" in Maxwell's proposed construction is superfluous and misleading. It is superfluous because parties agree that the electrode is an electric conductor, which means it is capable of transferring electric charge, and so there is no need to state it again later in the construction as Maxwell proposes.

In addition, Maxwell's "and/or" is misleading, as it suggests <u>in the disjunctive portion</u> that the electrode can be merely an extension of terminals 305 and 306 shown above and <u>not store</u> the electronic charge. This is an important distinction, as the claimed supercapacitors transfer charge into and out of the electrode during the charge and discharge phases, respectively, but store the charge in the carbon coating of the electrodes between charge and discharge phases. An electrode that did not store charge would result in a nonfunctional device. In that sense, Maxwell's construction is contrary to the description of the electrode in the specification of the patents-in-suit, as discussed above.

For the foregoing reasons, CAP-XX urges that its proposed construction for the claim term "electrode" is more accurate and supported by the specification of the patents-in-suit.

### 2. *Defendant's Answering Position*

"Electrode" is a broad and generic term that has a well-established plain and ordinary meaning within the art of electrical devices. The specification provides no

express **definition** or teaching that warrants a departure from the plain and ordinary meaning of "electrode" here.

The Authoritative Dictionary of IEEE Standards Terms (7th ed. 2000) defines "electrode" as "[a]n electric conductor for **the transfer of charge** between the external circuit and the electroactive species in the electrolyte." (Ex. I (definition of "electrode") (emphasis added)). The Wiley Electrical and Electronics Engineering Dictionary (2004) defines "electrode" as "[a] conductor which serves to deliver, receive, collect, emit, deflect, **or** control electric charge carriers." (Ex. J (definition of "electrode") (emphasis added).) Maxwell's proposed construction for "electrode" is consistent with the plain and ordinary meaning of the term as set forth in these standard dictionary definitions within the art. Indeed, CAP-XX admits that an "electrode" is "capable of transferring charge," as specifically set forth in Maxwell's proposed construction. (*See* pages 14, *supra*.)

Yet, despite admitting that an "electrode" must be capable of "transferring charge," CAP-XX nevertheless asks the Court to exclude "transferring charge" from the construction of this term as it is allegedly "superfluous" of both parties' agreement that an "electrode" is an "electric conductor." (*Id.* at 14-15) There is no reasoned justification for refusing to include an admittedly accurate description of an "electrode" on this ground. Indeed, even the dictionary definitions provided above demonstrate the recognition that the inclusion of "transferring charge" (and

other functions) is part of the appropriate definition of an "electrode" beyond merely identifying that an electrode must be an "electrical conductor."   Additionally, following CAP-XX's logic, there would be no need to include "capable of storing charge" within either parties' proposed construction since it would be superfluous because any electrical conductor is also inherently capable of storing charge, "and so there is no need to state it again later in the construction."  (Page 15, *supra*.)

Additionally, CAP-XX's assertion that the "and/or" in Maxwell's construction is misleading is without substantive merit.  The "and/or" in Maxwell's proposed construction is meant to embrace the broad nature of the term "electrode" such that it is not unduly narrowed by CAP-XX.  CAP-XX agrees that an electrode can act to transfer charge under certain circumstance *or* store charge under different circumstances.  (*See id.*)  When both of these are being done at the same time, such as during charging, the electrode will be both storing *and* transferring charge.  When the electrode is discharging, it is no longer serving to store charge, but merely transferring the stored charge.  Maxwell's construction embraces these admittedly different features of an "electrode."  Accordingly, Maxwell's construction is proper and should be adopted.

Conversely, there is nothing in the intrinsic record to support CAP-XX's requirement that an "electrode" is only "capable of storing a charge when voltage is applied to the cell."  (*Id.* at 13.)  First, there is nothing in the plain meaning of the

17

term "electrode" that requires what would otherwise admittedly be an "electrode" to cease being an "electrode" if it wasn't in "the cell." For example, an "electrode" can be used without a "porous separator" (i.e., not within "the cell" as recited in the claims) and it would still be an "electrode." Second, the "when" temporal limitation is incorrect by CAP-XX's own admission. A voltage is applied to the cell during charging of the cell, and that storing of the charge occurs "between the charge and discharge phases." (Page 15, *supra*.) That is, according to CAP-XX, "storing of a charge" occurs *after* the voltage is applied. There is no basis for a temporal limitation on the construction of "electrode" that limits "storing a charge" to only "when a voltage is applied" and not also after a voltage has been applied. Again, Maxwell's construction properly provides no temporal limitation associated with an "electrode" being capable of "storing" a charge.

Furthermore, CAP-XX's proposed "when voltage is applied to the cell" seems to be motivated by an unstated attempt to impermissibly tether language onto the construction of "electrode" such that CAP-XX could later somehow argue that the claimed "electrode(s)" are limited solely to carbon-based electrodes. This is reflected in CAP-XX's repeated reference to disclosures within the specification relating solely to embodiments describing electrodes with carbon. (*See* pages 14-15, *supra* ("the electrodes include a coating 310 of high surface area carbon," "[t]he '034 patent explains that capacitors with carbon coated electrodes operate differently

than electrodes in traditional capacitors and further explains that the charge build-up occurs on the surface of the carbon layer," "store the charge in the carbon coating of the electrodes").)

There is nothing in the intrinsic record that would justify limiting the term "electrode" to merely an "electrode" that includes carbon. First, an "electrode," as reflected in both parties' express constructions, can be any "electrical conductor" and is not limited solely to electrodes containing carbon. Second, there is no express lexicography or disavowal of any claim scope of "electrode" such that the term could be construed in such a narrowing fashion. To the contrary, the specification expressly states that "[t]he electrodes are preferably aluminum foil" and refers to them as "the metallic electrodes" separate and apart from any carbon. ('034 patent, 20:37, 21:59-63.)

Finally, the claim language itself reflects that the term "electrode" is not (and cannot) be limited to only an "electrode" that contains carbon. For instance, independent claim 1 of the '034 patent generically recites "a first electrode" and "a second electrode." ('034 patent, cl. 1.) Dependent claim 12 recites "[a] device according to claim 1 wherein at least *one of the electrodes includes a layer containing a carbon*." ('034 patent, cl. 12 (emphasis added).) The first necessary implication of dependent claim 12 is that neither the "first electrode" nor "second electrode" of independent claim 1 requires carbon. The second necessary

19

implication of dependent claim 12 is that only **one** of the first electrode or second electrode must have carbon to satisfy dependent claim 12, and the other electrode need not have carbon.  Simply, any assertion or inference by CAP-XX that the claims are somehow necessarily limited solely to "electrode(s)" that include carbon should be rejected.  *See Phillips*, 415 F.3d at 1314-15 ("the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim"); *SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1122 (Fed. Cir. 1985) (*en banc*) ("[i]t is settled law that when a patent claim does not contain a certain limitation and another claim does, that limitation cannot be read into the former claim").

The term "electrode" is recited and utilized in the claims and intrinsic record without any limitation on its plain meaning.  CAP-XX broadly recited "electrode" within the claims.  Maxwell's proposed construction captures that breadth, whereas CAP-XX wrongly ignores the full scope of the term "electrode."

### 3.   *Plaintiff's Reply Position*

Maxwell acknowledges that claims of the patents-in-suit recite devices within the general category of "electrochemical capacitors."   Section II *supra*, pp. 6-7.  In addition, the parties agree that the "electrode," in such capacitors, is an electric conductor capable of storing a charge and transferring that stored charge during operation.  Section VI.A.2 *supra*, pp. 16-17.  Given Maxwell's complaint that CAP-

XX's proposed construction does not expressly refer to the electrode transferring a charge, CAP-XX modified its proposed construction, as shown in italics above, to expressly recite "and transferring a charge," in a further effort to resolve the dispute regarding this claim element.

Maxwell's proposed construction remains objectionable because of its inclusion of "or."  For the claimed devices, charging involves applying an external voltage to the cell to charge the cell.  The electrodes transfer the electrical charge from the external power source to the active sites on the electrodes (the surface), where it is stored.  During the discharge phase, it transfers that stored charge to an external circuit.  Hence, the electrode must be <u>capable of</u> transferring and storing at all times -- there is no basis for the disjunctive "or" in Maxwell's proposed construction.  If "or" is deleted from the proposed construction, it would be acceptable to CAP-XX.

Maxwell in its response cites to a general definition for an electrode from <u>Wiley Electrical and Electronics Engineering Dictionary</u>, as support for its use of "or" in its construction.  Section VI.A.2 *supra*, pp. 21-22. However, that definition is very general and does not apply to the charge storage devices at issue here.  It provides that an electrode is a "conductor which serves to deliver, receive, collect, emit, deflect, *or* control electric charge carriers."  Exh. J, JA158 (emphasis added). The "or" in that definition does not apply here, where the parties agree that the

electrodes are capable of storing <u>and</u> transferring the charge in the claimed charge storage devices, as discussed above.

CAP-XX's inclusion of the phrase "when voltage is applied to the cell" should not be <u>controversial</u>, as it merely states the basic operation of a supercapacitor being charged when an external voltage is applied from an external, power source, as discussed above. Maxwell argues that "when voltage is applied to the cell" connotes a temporal limitation that a charge is *only* stored at that time. Section VI.A.2 *supra*, p. 18. CAP-XX's proposed construction is not so limited, and Maxwell's argument is nonsensical in the context of the claimed charge storage devices. Maxwell cannot seriously dispute that such devices store a charge when an external voltage source is applied and maintain that charge, even when the voltage source is removed. The construction of the term "electrode" does not have to explain this fundamental operation of a capacitor.

### 4.    *Defendant's Sur-Reply Position*

CAP-XX does not dispute that "electrode" is a broad and generic term that has a well-established plain and ordinary meaning within the art. Nor does CAP-XX contend that the intrinsic record imposes a specialized definition for "electrode" that would justify departure from that meaning. *See Thorner v. Sony Comput. Ent. Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012). As such, Maxwell's proposed

construction derived directly from the recognized meaning of "electrode" should be adopted.

Indeed, CAP-XX has not identified anything that would constitute an "electrode" under Maxwell's proposed definition but would not be recognized as an "electrode" to a POSITA within the asserted claims.  In contrast, CAP-XX's inclusion of "when voltage is applied to the cell" is not necessary and could unduly limit the term by CAP-XX's own admissions.  First, an "electrode" is a term defined irrespective of its inclusion in "a cell."  Additionally, CAP-XX asserts that an "electrode" will "store a charge when an external voltage source is applied ***and maintain that charge, even when the voltage source is removed***."  (Page 22, *supra*.) This belies any temporal requirement onto the term "electrode" that only applies "when voltage is applied to the cell," as CAP-XX concedes that the "electrode" is capable of storing charge *after* a voltage has been applied (i.e., when it is in an "open circuit").  Furthermore, electrodes can store charge even without an applied voltage, such as when electrodes possess an inherent voltage differential.  Accordingly, CAP-XX's proposed construction is incorrect and should not be adopted.

**B.    "Electrolyte"**

| Claim Term / Phrase | Claim Number(s) | Plaintiff's Proposed Construction and Supporting Intrinsic Evidence | Defendant's Proposed Construction and Supporting Intrinsic Evidence |
|---|---|---|---|
| "electrolyte" | the '034 patent, cls. 1, 13, 23, 34, 42, and 51<br><br>'600 patent, claim 1 | An ionically conducting liquid that does not allow the transfer of an electronic charge between opposing electrodes via the electrolyte.<br><br>*See e.g.,* the '034 patent, 20:38-54; 23:39-43; and 28:27-29. | A liquid medium in which the flow of electric current takes place by migration of ionic species.<br><br>*See e.g.,* the '034 patent 1:13-20; 1:53-67; 20:16-18 |

### 1.    *Plaintiff's Opening Position*

The parties agree that the electrolyte is a liquid that provides for the flow of ions.  CAP-XX's construction is more complete, as it also states that the electrolyte <u>does not</u> allow the transfer of an electronic charge between the electrodes via the electrolyte.  Referring back to Fig. 21, the '034 patent explains that separator 307 is disposed between the electrodes 202 and 304 in a fixed, spaced apart configuration. *See also,* Exh. D, Plaintiff's Technology Tutorial, slides 6-8.  A skilled artisan would understand that this configuration is necessary to prevent an electronic charge from travelling between the electrodes, causing the cell within a charge storage device to fail.  With regard to Figure 21, the patents-in-suit also explain that, while the

electrolyte is not shown, it is contained within the sealed housing and interspersed between the electrodes and separators.  Exh. A, the '034 patent, 28:12-29; *see also,* Exh. D, Plaintiff's Technology Tutorial, slides 6-8.  Hence, a skilled artisan would recognize that the electrolyte also <u>does not allow</u> an electronic charge to travel between the electrodes via the electrolyte, as that would cause the cell to fail.

CAP-XX disputes the portion of Maxwell's construction that states that there is a "flow of electric current" via the electrolyte.  This portion of Maxwell's proposed construction is confusing, as it conflates (1) the flow of ions that migrate in connection with the build-up of an electronic charge on the electrodes during the charging phase, which the electrolyte facilitates, with (2) the flow of "electric current" between the electrodes via the electrolyte, which the electrolyte prohibits. The claims recite a charge <u>storage</u> device, and an <u>electrically conducting</u> electrolyte (as opposed to an <u>ion conducting</u> electrolyte) would make such storage impossible for the capacitors described in the specification of the patents-in-suit.

For the foregoing reasons, CAP-XX urges that its proposed construction for the claim term "electrolyte" is more accurate

### 2.    *Defendant's Answering Position*

The term "electrolyte" is used within the asserted patents in accordance with its well-understood and non-controversial plain and ordinary meaning within the art. *The Authoritative Dictionary of IEEE Standards Terms* (7th ed. 2000) defines

"electrolyte" as "[a] conducting medium in which the flow of electric current takes place by migration of ions." (Ex. I (definition of "electrolyte").) Maxwell's construction of "electrolyte" is effectively a verbatim recitation of this applicable dictionary definition, which is supported by the intrinsic record, and should be adopted.

Maxwell's modification of the dictionary definition of "electrolyte" is the clarifying replacement of "conducting medium" with "liquid medium." CAP-XX contends that "[t]he parties agree that the electrolyte is a liquid," so there should not be any dispute concerning this aspect of Maxwell's proposed construction. (Page 24, *supra*.) However, for certainty, Maxwell contends that the phrase "liquid medium" includes, for example, gels or other electrolytes that include water or a non-aqueous liquid within which ions can migrate.[8]

The claims and intrinsic record of the patents-in-suit broadly and generically recite the term "electrolyte" without limitation. CAP-XX cannot reasonably dispute the dictionary definition applied by Maxwell for "electrolyte" embraces the full meaning of the term as it is used within the intrinsic record. CAP-XX nevertheless seeks to add an unnecessary, undefined, and unexplained limitation to what is plainly recognized as an "electrolyte" by proposing that the claimed "electrolyte" has a

---

[8] This is also consistent with another technical dictionary that defines "electrolyte" as "[a] substance which dissociates to a certain extent in a medium through which an electric current passes." (Ex. J (definition of "electrolyte").)

further functional requirement in that it "does not allow the transfer of an electronic charge between opposing electrodes via the electrolyte."  Beyond the various flaws with CAP-XX's proposal, as explained below, CAP-XX has not identified a single example of any "electrolyte" that meets Maxwell's proposed dictionary-based construction and that would not otherwise be recognized as an "electrolyte" by a person of ordinary skill in the art.  Accordingly, CAP-XX's assertion that its proposed construction is "more complete" appears to be merely a guise to try to impermissibly narrow the scope of the claims without disclosing how it intends to apply its proposed construction.  (*See* page 24.)

First, CAP-XX's proposed construction seeks to improperly impute a requirement to the term "electrolyte" such that it can only be determined when it is "between opposing electrodes."  As noted above, there is no requirement in the claims that the "electrolyte" be present in the "sealed package" between the electrodes.  (*See* Section VI.C.2, *supra*.)  Moreover, an "electrolyte" is a physical substance, irrespective of whether it is within a device or outside of the device.  For instance, the specification expressly states that the "[e]lectrolyte is then added to the can . . . ." ('034 patent, 20:16-18.)  This statement demonstrates that the "electrolyte" exists and is identified before it is placed into a device (or between opposing electrodes).

Second, CAP-XX's proposed construction provides no indication as to meaning of the phrase "does not allow the transfer of an electronic charge" or the conditions under which such a determination is to be made. Does the requirement of "not allow[ing] the transfer of an electronic charge" mean that the electrolyte has to be a perfect insulator and cannot permit a single electron to be conducted between the electrodes? If not a perfect insulator, then how much electronic charge is permitted to be transferred? Also, what voltage is to be applied to determine whether the "electrolyte" does or does not transfer electronic charge? Finally, the patent discloses a generic description of an electrolyte as follows: "the electrolyte is acetonitrile with TEATFP." ('034 patent, 23:8-9.) Is acetonitrile with TEATFP an electrolyte under CAP-XX's proposed construction? Does this remain true even if the applied voltage in the device changes? Does the applied voltage in the device control whether acetonitrile with TEATFP is or is not an electrolyte under CAP-XX's proposed construction, despite the specification's clear indication that it is an "electrolyte" *per se*? CAP-XX's opening brief answers none of these critical questions addressing the various flaws of its proposed construction.

### 3. Plaintiff's Reply Position

The dispute between the parties regarding the construction of electrolyte is whether it facilitates the flow of electrical current, i.e., the flow of electrons, between the electrodes. As discussed below, Maxwell's proposed construction should be

rejected for at least three reasons: (i) it is contrary to the teachings in the specification of the patents-in-suit; (ii) it violates a basic tenet of claim construction, as it would render the claimed charge storage devices nonoperational; and (iii) it is based on extrinsic evidence (a definition) that should be ignored because it conflicts with the intrinsic record, i.e., the specification of the patents-in-suit, and is otherwise too ambiguous.

With regard to the intrinsic record, the specification of the patents-in-suit explains:

> As will be appreciated by those skilled in the art separator 54 maintains the opposed layers 62 [of the electrodes] in a spaced apart configuration <u>to prevent electrical conduction therebetween</u>. However, <u>separators 52 do allow movement of the ions within the electrolyte</u> between layers 62.

'034 patent, 23:39-43 (emphasis added). Similarly, it explains that separators are also used to prevent the flow of electrical current between cells, when there are multiple cells in the sealed package, as follows:

> Where use is made of a plurality of capacitive elements, a porous separator is disposed between adjacent elements to prevent electrical shorting.

'034 patent, 21:19-21. Hence, the patents-in-suit teach that the charge storage devices are constructed to prevent the flow of electric current between electrodes and similarly between multiple cells of electrodes in the same sealed packaging. The

reference to "flow of electric current" in Maxwell's construction should be rejected because it is contrary to the intrinsic record referenced above.

Indeed, the specification teaches <u>not to conduct electric current between electrodes</u>, as it would short circuit the device causing it to fail, *i.e.*, the electrodes would not store a charge. It is axiomatic that where the claim language permits an operable construction, the inoperable construction is wrong. *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 904 F.3d 965, 972 (Fed. Cir. 2018) (citing *Ecolab, Inc. v. FMC Corp.*, 569 F.3d 1335, 1345 (Fed. Cir. 2009)). Here, "electrolyte" can be properly construed in accordance with the teachings in the specification, as proposed by CAP-XX, without rendering the claimed devices inoperable. Hence, Maxwell's proposed construction should be rejected.

Maxwell erroneously conflates the flow of ions in the electrolyte with the flow of electric current in the electrodes. Extrinsic evidence cited by Maxwell, the textbook entitled, <u>Electrochemical Supercapacitors, Scientific Fundamentals and Technological Application</u>, explains the difference between those processes. It provides that a capacitor's charge and discharge cycles are highly reversible because "[o]nly electrons need to be moved to and from electrode surfaces through the external circuit, and cations and anions of the electrolyte transported within the solution to the charged surfaces." Exh. F, p. 12. This "double-layer" of charges is also discussed in the specification of the patents-in-suit, as cited above. It is also

where the products made by the parties, electric <u>dual layer</u> capacitors or "EDLCs,"

got their name.

Maxwell's technical reference further explains the operation of "double-

layer" capacitors in Chapter 6 as follows:

> It is essential to explain at the outset that a practical
> electrochemical capacitor, utilizing the double-layer
> capacitance of an electrode/solution interface, must be
> constructed with *two such interfaces* (as emphasized in
> Chapter 5), which are worked against each other (i.e., one is
> charged positively and the other negatively) with respect to
> the electrolyte solution, with a separator (as in a battery cell)
> usually being arranged between the two electrodes. The two
> electrode, two-interface system in a single capacitor cell is
> illustrated in Fig. 6.1(a).

Exh. F, pp. 106-107. Fig. 6.1(a) is inserted below:



**The Double Layer at Capacitor Electrode Interfaces**                    **107**

Configuration of an electrochemical
capacitor requiring two electrodes
and thus two double-layers

31

Exh. F, p. 107; *see also,* Exh. D, Technology Tutorial, pp. 6-8. Hence, Maxwell's technical reference also supports CAP-XX's proposed construction, as it explains and shows that a porous separator provides for the migration of ions, while preventing the flow of electric current between the electrodes.

Maxwell's proposed construction is based on its hand-selected IEEE definition, which it cites for the proposition that an electrolyte is "a conducting medium where the flow of electric current takes place by migration of ions." Section VI.B.2 *supra*, pp. 25-26. First, that extrinsic evidence should be ignored, as it is inconsistent with the specification of the patents-in-suit. *See Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1269 (Fed. Cir. 2001) (Even if extrinsic evidence is considered, however, it cannot be used "to vary, contradict, expand, or limit the claim language from how it is defined, even by implication, in the specification or file history.") Second, the definition is ambiguous, in that, it <u>does not</u> state that electric current is conducted by the electrolyte <u>to the electrodes</u>; rather, it discusses the flow of ions within the electrolyte. Third, the definition of "electrode" from the same dictionary clarifies that electric current is not conducted between the electrolyte and electrodes. It states:

> Note: Specifically, in an electrolytic cell, an electrode is a conductor at the surface of which a change occurs from conduction by electrons to conduction by ions or colloidal ions.

Exh. I, JA153.  Similarly, Maxwell's other technical reference discussed above explains the double layer of charge at the interface between the electrolyte and electrodes and the difference between the flow of ions in the electrolyte from the flow of electric current in the electrodes.  In short, Maxwell's proposed construction should be rejected because its only alleged support is a hand-selected IEEE definition that is contradicted by the patents-in-suit and Maxwell's other cited extrinsic evidence.

### 4.    *Defendant's Sur-Reply Position*

CAP-XX's arguments seeking a non-plain meaning construction are technically incorrect and should be rejected.

Foremost, CAP-XX misunderstands the term "electric current," in Maxwell's proposed construction and from the IEEE dictionary.  A POSITA understands that an "electric current" occurs based on the movement of electric charge carriers such as ions: "Electric current, any movement of electric charge carriers," such as ions. (Ex. M; Ex. N ("An electric current is a stream of charged particles, such as electrons or ions, moving through an electrical conductor or space.").)  CAP-XX's various assertions all rely on the incorrect proposition that the movement of ions within an electrolyte does not result in an electric current.  (*See* pages 29-33, *supra*.)  These arguments should be rejected.

Indeed, various definitions of "electrolyte," beyond the IEEE dictionary

previously cited by Maxwell, universally recognize the fundamental aspect of an "electrolyte" as conducting an electric current by the migration of ions. (*E.g.*, Ex. O ("current is carried by the movement of ions"; "conducts an electric current"); Ex. P ("the flow of current is accompanied by the movement of matter in the form of ions"; "forms a conductor of electricity"; "that conducts electricity"; "an electrically conductive medium"; "conducting electrical current"); Ex. Q ("an electrically conducting solution"; "acquires the capacity to conduct electricity").) CAP-XX has provided no evidence that the plain meaning of "electrolyte" does not properly include an electrical current by the migration of ions.

CAP-XX's reference to the function of the "separator" in the accused devices does not redefine the plain meaning of "electrolyte." The separator is present to keep the electrodes from physically touching one another, which would cause a short circuit in the device. The "electrolyte" provides an electrical current by the movement of ions that necessarily must counterbalance the electrical current flowing from the electrodes, as the patent discloses: "separators 52 do allow movement of the ions within the electrolyte." ('034 patent, 23:42-43.)

### C.    "Sealed Package"

| Claim Term | Claim Numbers | Plaintiff's Construction | Defendant's Construction |
|---|---|---|---|
| "a sealed package for containing the cell and an | the '034 patent, cls. 1, 13, 23, 34, 42, and | No construction necessary.<br><br>Alternatively, the | A sealed package that is capable of containing "the cell" and an "electrolyte". |

| [organic] electrolyte" / "a sealed package for containing the electrodes, the separator and an electrolyte" | 51<br><br>'600 patent, claim 1 | sealed package contains the cell and electrolyte.<br><br>*See e.g.,* the '034 patent, Abstract, Figs. 5-11A and 18-21; 2:13-15; 2:30-34; 2:62-64; 3:11-17; 17:34-37; 22:66-23:17; 23:31-37; and 25:26-28. | *See e.g.,* the '034 patent 2:30-39; 3:51-64 |

### 1.    *Plaintiff's Opening Position*

CAP-XX urges that this term does not require construction, as a juror will understand, without further instruction from the Court, what a sealed package entails.  Indeed, the parties' proposed constructions do not define the term "sealed package;" rather, they merely refer to the "sealed package".  The parties also agree on what is included in the sealed package, that is, the electrodes, separator, and electrolyte.  In short, this term does not require further construction.

If the Court elects to construe this term, CAP-XX disputes Maxwell's use of the phrase "capable of containing," as that phrase is more harmful than helpful.  It would likely cause confusion, as that phrase is inconsistent with "sealed package." The plain language of the claim recites a *sealed* not *sealable* package.  Hence, the package is not merely "capable of containing" – it contains the electrodes, separator, and electrolyte, and it is *sealed*.  In the same vein, each of the asserted claims recites

a charge storage device, not one or more components merely capable of being assembled into such a device.

Referring back to Figure 21, it shows the sealed packaging 302, which is described in the specification as a sealed housing. *See* Exh. A, the '034 patent, 28:12-13. It later explains that terminals 305 and 306 extend from the inside to the outside of the housing and are "sealingly engaged" between their respective ends with the housing. Similarly, with respect to Figure 7, the patents-in-suit provide that a rectangular sealed package 55 contains electrodes 52 and 53, separators 54, and an electrolyte 56 in the with electrodes are immersed. *Id.* at 23:5-8. Hence, CAP-XX urges that its construction for the sealed package is correct and more consistent with the plain language of the claim and specification of the patents-in-suit.

### 2. *Defendant's Answering Position*

Unlike CAP-XX's proposed construction, Maxwell's construction of "a sealed package for containing the cell and an [organic] electrolyte" / "a sealed packaged for containing the electrodes, the separator and an electrolyte" takes into account the actual claim language identified for construction and claim differentiation principles.

A construction of this term is necessary because, as the parties' dispute highlights, it is unclear whether the sealed package must actually contain or merely be capable of containing the cell and electrolyte. CAP-XX argues that a jury would

understand the meaning of a "sealed package," but that does not reflect the entire claim term that is in dispute and requires construction. (*See* page 35, *supra*.) Both parties agree that "sealed package" requires no separate construction, as neither party has sought to separately define that term.

Moreover, CAP-XX's argument concerning the distinction between "sealed" and "sealable" is a red herring. (*Id.*) The claims merely recite "a sealed package . . . ." Maxwell does not dispute and has not suggested that it is merely "[a] *sealable* package." (*Id.* at 35-36.) Likewise, however, there is nothing in the claims or intrinsic record that requires that the "sealed package" to be permanently sealed such that it could not be unsealed. All that is required is a "sealed package" without further limitation.

Consequently, the heart of the parties' dispute concerns the recitation of "*for containing*" instead of simply "containing"—i.e., whether the "sealed package *for containing* the cell and an electrolyte" should be construed to mean that the package is capable of containing or actually contains those components. The claim language itself recites an intended use of the sealed package, implying the sealed package merely must be capable of or configured to contain the cell and an electrolyte. (*See* '034 patent, cls. 1, 13, 23, 34, 42, 51 ("a sealed package for containing").) There is no requirement in the independent claims that the sealed package *must* contain the cell and electrolyte. The inventors' chosen language of "for containing" must be

given effect because it is clear that they understood how to recite claims in which the sealed package was required to contain the cell and an electrolyte.  (*See* '072 patent, cl. 42 (demonstrating the inventors' separately claimed "sealed package" must contain these components by expressly reciting: "containing in a sealed package the electrodes, the separator and an electrolyte in which the electrodes are immersed").)

Moreover, dependent claims add the requirement that the package must contain the cells, indicating that the independent claims are broader and do not necessarily have this additional requirement. (*See* '034 patent, cls. 10, 19, 30, 38, 46, and 59 ("the package contains the cells").)  For example, claim 10 of the '034 patent expressly recites the requirement that "the package contains the cells."  Under the doctrine of claim differentiation, no two claims should be read to cover the same scope and the Court may presume differences when different language is used. *Tandon Corp. v United States Int'l Trade Comm'n*, 831 F.2d 1017, 1023-24 (Fed. Cir. 1987). Unlike the independent claims which recite that the sealed package is "for containing" the cell, the dependent claims recite that the sealed package actually "contains" the cells. If the independent claims were interpreted to require containing the cell, claims 10, 19, 30, 38, 46, and 59 would be superfluous. The difference in claim drafting—the package "contains" versus the package "for containing"—also highlights the difference in meaning.

Thus, Maxwell's construction of "a sealed package for containing the cell and an [organic] electrolyte"/"a sealed package for containing the electrodes, the separator and an electrolyte" as a "sealed package that is capable of containing 'the cell' and an 'electrolyte'" is consistent with the claim language and intrinsic record.

### 3.    *Plaintiff's Reply Position*

Maxwell argues that the dispute between the parties lies in the phrase "for containing," and asserts that "for containing" means that the package may include <u>but does not necessarily include</u> the recited components electrode, separator, and electrolyte. Section VI.B.2 *supra*, pp. 36-37. This argument is contrary to the plain language of the claims and the specification of the patents-in-suit. By way of example, claim 1 of the '034 patent recites "a sealed package for containing the cell *and* an electrolyte *in which the cell is immersed*". '034 patent, 31:7-10 (emphasis added). That claim uses the conjunctive "and," not "or" or even "and/or," meaning the package contains at least those components. Also, the claim states that the cell is immersed in the electrolyte. Maxwell fails to explain how the sealed package could include the cell <u>but not</u> the electrolyte, when the claim states that the cell is "immersed" in the electrolyte. All of the independent claims of the patents-in-suit recite the same or similar language. Maxwell's argument should be rejected as it is contrary to the plain language of the claims.

In addition, the specification explains, repeatedly, that the sealed packaging includes the electrodes, separators, and electrolyte, in which the electrodes are immersed, as recited in the claims.  With regard to Fig. 2, it explains that the package (housing 2) includes the electrodes, separators, and electrolyte.  '034 patent 17:29-31. It later explains that after the electrodes and separators are placed in the package, the electrolyte is added so that the capacitive element is completely covered.  *Id.*  at 19:47-59.  It explains that electrolyte is added in several steps until no more electrolyte can be added, and then the housing is sealed.  *Id.*  at 19:56-65.  Similarly, with regard to Example 1, the specification explains that the sealed packaging contains the electrodes, separator, and electrolyte in which the electrodes are immersed.  *Id.*  at 22:42-45.  It later explains that the package is *sealed*, in part, to prevent the loss of electrolyte therefrom.  *Id.*  at 23:1-5.  Hence, not only does the specification and claims expressly state that the packaging contains the electrodes, separators, and electrolyte, it teaches that one of the reasons for "sealing" the packaging is to avoid the loss of electrolyte therein.  *See also*, Exh. K, p. 17, explaining that the supercapacitors are "hermetically sealed" and contain the electrolyte.  Maxwell's argument that the sealed package need not contain electrolyte is specious.

Maxwell's argument based on claim differentiation is likewise without merit. It argues that since claim 10 recites that the package contains the cells, it must be

optional in claim 1. Section VI.A.2 *supra*, p. 38. Claim 10 depends from claim 9, which adds the limitation that the charge storage device of claim 1 includes a plurality of cells. '034 patent, 31:55-56. Claim 10 then adds the limitation that the packaging recited in claim 1 contains all of the cells, that is, the plurality of cells recited in claim 9 and not just the cell recited in claim 1. Claims 1 and 10 are properly distinct, in that, claim 1 requires one or more cells immersed in electrolyte contained in a sealed package. Conversely, claim 10 requires multiple cells are immersed in electrolyte and contained in a *shared* sealed package. Every device covered by the patents must have one or more cells immersed in electrolyte to function. Hence, claims 9 and 10 support CAP-XX's proposed construction that the sealed packaging contains the electrodes, separator, and electrolyte. Maxwell's claim differentiation argument is based on the wrong distinction and cannot justify an interpretation that is inconsistent with how the claimed devices must function. *See* Exh. K, p. 15, one cause of supercapacitor failure is loss of the electrolyte.

### 4.    *Defendant's Sur-Reply Position*

Maxwell's construction of this term gives appropriate weight to the plain language of the asserted claims and should be adopted. Even though the claim language itself states that the sealed package is "for containing" the cell and an electrolyte, CAP-XX urges the language means the sealed package *must* contain those components. CAP-XX describes various embodiments in the specification

that recite instances in which the sealed package contains the cell and electrolyte. (*See* page 39-40, *supra*; *see also* '034 patent, 9:13-14 ("a package defining a sealed cavity containing an electrolyte").) These embodiments, however, cannot undo the plain language of the claim, which does not require that both the cell and electrolyte are contained within the sealed package—only that the package be capable of containing them. Maxwell's construction gives meaning to the claim language as drafted.

CAP-XX's argument using the conjunctive "and" to indicate the cell and electrolyte must be contained within the sealed package is unpersuasive. (*See* pages 39-40, *supra*.) The use of "and" within the claim merely indicates the package must be capable of containing both the cell *and* an electrolyte.

Even though dependent claims 9 and 10 disclose that multiple cells are contained within a sealed package, the juxtaposition of language between claims 1 and 10 further supports Maxwell's construction. Independent claim 1 recites a sealed package "for containing" the cells and electrolyte; whereas narrower dependent claim 10 recites that the same package actually "contains" the cells. First, the inventor could have drafted claim 1 to require the sealed package to contain both the cell and electrolyte by reciting "contains" instead of "for containing." Second, claim 10 does not require that the package contain the electrolyte. Accordingly, while claim 10 may require that the package contain a plurality of cells, independent

claim 1 only requires a sealed package that is capable of containing both a cell and an electrolyte.

### D.    Maximum Operating Voltage of The Cell/The Device

| Claim Term | Claim Number(s) | Plaintiff's Construction | Defendant's Construction[9] |
|---|---|---|---|
| "maximum operating voltage of the cell" | '034 patent, cls. 1-3, 13-15, 23-25, 34-36, 42-44, 51-53 | The voltage at which the packaged cell is designed to operate under normal conditions in conjunction with the other components of the device.<br><br>*See e.g.,* the '034 patent, Figs. 17 and 20; 16:43-17:17; 22: 37-54; 1:62-67; and 26:20-30. | The highest potential operating voltage <u>that does not break down the weakest electrode</u> of "the cell"<br><br>*See e.g.,* the '034 patent 1:59-67; 2:30-39; 2:44-49; 22:43-54 |
| "maximum operating voltage of the device" | '600 patent, cls. 11-13 | The voltage at which the device is designed to operate under normal conditions.<br><br>*See e.g.,* the '034 patent, Figs. 17 and 20; 16:43-17:17; 22: 37-54; 1:62-67; and 26:20-30. | The highest potential operating voltage <u>that does not break down the weakest electrode</u> of "the device"<br><br>*See e.g.,* the '034 patent 1:59-67; 2:30-39; 2:44-49; 22:43-54 |

---

[9] Maxwell slightly modified its construction of this term in its sur-reply and revisions are indicated in underline. Maxwell made this modification in response to CAP-XX's reply and in an attempt to clarify the disputes for the Court, as explained more fully below.

### 1.    Plaintiff's Opening Position

CAP-XX proposes that the Court construe this term in the same manner as in the *Ioxus* case.  *See* Exhibit C, p. 3. The claim term "maximum operating voltage" is a commonly employed term of art in the field of charge storage devices, and typically refers to the "rated voltage" of such devices.  By way of example, a technical dictionary for electronics, published in 1999, provides the following definitions for "rated voltage":

> **rated voltage –** 1. The voltage at which a device or component is designed to operate under normal conditions. 2. The maximum voltage at which an electric component can operate for extended periods without undue degradation or safety hazard.

*See,* Exhibit E hereto, Rudolf F. Graf, The Modern Dictionary of Electronics, Seventh Edition (1999).

Similarly, the patents-in-suit provide:

> In a supercapacitor with symmetrical carbon based electrodes, the voltage is equally distributed across both electrodes.  During operation, the maximum capacitor voltage is limited by the breakdown voltage of the weakest electrode. A higher operating voltage can be achieved by

> tailoring the capacitance of each electrode to fully utilise the
>
> available voltage window. This is conveniently achieved by
>
> using different carbon loadings on each electrode.

*See* Exh. A, the '034 patent, 22:46-54.  Hence, consistent with the above-referenced definition, the patents-in-suit explain that the maximum operating voltage for a supercapacitor is the voltage at which the capacitor will operate without breaking down the weakest electrode.

In addition, the patents-in-suit elsewhere use the terms "maximum operating voltage" and "rated voltage," synonymously.  As referenced above, the Figure of Merit for a charge storage device is determined, in part, using voltage V, which refers to the rated voltage of a device.  *See* Exh. A, the '034 patent, 16:55-59.  Elsewhere, the patents-in-suit provide that Pmax is calculated with voltage V, where V is the maximum operating voltage.  *Id.* at 22:37-40; 26:20-37.  The Pmax and FOM values for several devices are reported in tables shown in Figures 17 and 20 of the '034 patent.  *See* Exh. A, the '034 patent.  Those tables include a column for the rated voltage of the devices listed therein.  *Id.*  The same rated voltage for each of those devices was used to calculate the FOM and Pmax values reported in that table.

Maxwell's proposed construction is ambiguous, as it is not apparent what "highest potential" operating voltage references.  Such ambiguity is unnecessary given that the Court previously construed this term, and it does not add clarity to the

meaning of the claim term that would assist this Court or jurors in deciding infringement or invalidity defenses asserted in this matter.

Given the support for CAP-XX's proposed construction in the specification of the patents-in-suit, referenced extrinsic evidence, and the Court's prior construction of this claim term, CAP-XX urges that its proposed construction for maximum operating voltage is correct.

### 2. *Defendant's Answering Position*

There are two distinct terms in dispute: (1) the "maximum operating voltage of the cell" and (2) the "maximum operating voltage of the device." Maxwell's constructions give meaning to the word "maximum" as meaning the "highest potential" and reflects the difference between "the cell" and "the device" terms by referring to their constructions above.

CAP-XX cites to the specification's explicit definition that "the maximum capacitor voltage is limited by the breakdown voltage of the weakest electrode." (Page 44-45, *supra* (citing '034 patent, 22:46-54.) CAP-XX then admits that "consistent with the above-reference ***definition*** [in the specification], the patents-in-suit explain that the maximum operating voltage for a supercapacitor is the voltage at which the capacitor will operate without breaking down the weakest electrode." (*Id.* (citing '034 patent, 22:46-54 (emphasis added).) This statement is in the context of a "supercapacitor" (i.e., "the device") and is precisely what is meant by Maxwell's

identification of the "highest potential operating voltage *of 'the device'*" in that the highest potential operating voltage of the device is defined as "the voltage at which the capacitor will operate without breaking down the weakest electrode." (*See also id.*) Thus, the intrinsic record's definition must control the construction of the disputed term—i.e., the breakdown voltage of the weakest electrode within the device defines the "maximum operating voltage of the device." *See Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1249 (Fed. Cir. 1998) (where "a patent applicant has elected to be a lexicographer . . . the definition selected by the patent applicant controls."). The term "the device" should be construed as set forth above with respect to the specific construction of that separately disputed term.

The proper construction of the "maximum operating voltage *of the cell*," as set forth by Maxwell, is similar except that it must be applied to the context of "the cell." That is, the "maximum operating voltage of the cell" is properly construed as the "highest potential operating voltage *of 'the cell*,'" as determined by the breakdown voltage of the weakest electrode of "the cell."

CAP-XX's proposed constructions for these terms suffer from various flaws. First, CAP-XX contends that the term "maximum operating voltage" is a commonly used term of art, but provides no evidence that this is so, what the commonly understood meaning of the term is, nor whether that meaning is consistent with the definition provided in the specification. Instead, CAP-XX supplies a dictionary

definition for a different term "rated voltage." (*See* pages 43-44, *supra*.)  But, the claims do not state "rated voltage," they recite the "maximum operating voltage." And, as CAP-XX recognizes, the specification refers to both the "maximum operating voltage" and a single instance of "rated voltage" in a different context concerning the calculation of the Figure of Merit, demonstrating that the inventors could have recited, if they actually intended to, "rated voltage" within the claims rather than the chosen "maximum operating voltage."  Moreover, CAP-XX has not identified anywhere in the specification that defines "maximum operating voltage" as synonymous with a "rated voltage," because the specification defines the "maximum operating voltage" as the breakdown voltage of the weakest electrode (of "the device" or "the cell").

Second, the "rated voltage" and "maximum operating voltage" have different values.  For instance, CAP-XX identifies both a "nominal" voltage (i.e., the rated voltage) and a "peak" voltage (i.e., maximum operating voltage) in connection with its own products.[10]  This further demonstrates that CAP-XX's purported attempt to

---

[10] *See* Ex. K at 4:

equate the "rated voltage" with the "maximum operating voltage," which is higher than the rated voltage.

Third, the definitions of "rated voltage" do not support CAP-XX's attempt to claim it is "synonymous[]" with "maximum operating voltage."  The first definition of "rated voltage" is "[t]he voltage at which a device or component is designed to operate under normal conditions."  (*See* pages 43-44, *supra*.)  This general electronics definition—that applies to any type of electrical device or component—is referring merely to an operating voltage, it is not directed to a "***maximum operating voltage***."  Nor does the definition clarify in the context of the present electrochemical capacitors what constitutes the "normal conditions" to apply.  As noted, the temperatures at which electrochemical capacitors operate vary widely.



| Voltage & Temperature | Product Name[1] | CAP[2] (± 20%)[3] | ESR[2] (max = Nom +20%)[3] | Body Size (mm) | Thickness[4] (max) | Minimum Order Quantity |
|---|---|---|---|---|---|---|
| **Dual cell modules** (2 cells connected in series) | | | | | | |
| 5.0V nominal 5.5V peak -40°C to +70°C T max = 70°C | GZ215F | 90 mF | 110 mΩ | 20.0 x 15.0 | 2.5 mm | TBA |
| | GA209F | 90 mF | 95 mΩ | 20.0 x 18.0 | 2.1 mm | 2,000 |
| | GA230F | 400 mF | 75 mΩ | | 3.5 mm | 2,000 |
| | GW209F | 160 mF | 55 mΩ | 28.5 x 17.0 | 2.1 mm | 300 |
| | GW201F | 400 mF | 55 mΩ | | 2.7 mm | 300 |
| | GW203F | 520 mF | 40 mΩ | | 3.4 mm | 2,000 |
| | GS203F | 270 mF | 35 mΩ | 39.0 x 17.0 | 2.1 mm | 2,000 |
| | GS206F | 680 mF | 35 mΩ | | 2.7 mm | 2,000 |
| | GS208F | 900 mF | 25 mΩ | | 3.4 mm | 2,000 |
| | GS230F | 1200 mF | 25 mΩ | | 3.9 mm | 200 |

**CAP-X** **Product Specifications**

4. G Series Product Specifications

(*See* footnote 5, *supra*.)    Additionally, it is unclear whether "under normal circumstance" relates to the nominal rated voltage or the maximum peak voltage during operation.

The second definition of "rated voltage" supports the construction of "maximum operating voltage" from the intrinsic record.  This second definition states "[t]he maximum voltage at which an electric component can operate for extended periods without undue degradation or safety hazard." (*See* pages 43-44, *supra*.) The specification makes clear that the "maximum operating voltage" is the breakdown voltage of the weakest electrode (of "the device" or "the cell"), which reflects the "undue degradation" within this definition.  However, again, there is no indication by CAP-XX that the nominal rated voltage or peak maximum voltage identified for electrochemical capacitors is actually the breakdown voltage of the weakest electrode as opposed to some other (non-maximum) operating voltage or due to other features that might otherwise limit the voltages that can be achieved by "the device" or "the cell."

Fourth, CAP-XX makes the unsubstantiated assertion that the patent's "tables include a column for the rated voltage of the devices listed therein." (Page 45, *supra*.) There is no identification within the patent as to whether the "Voltage (V)" as reported in any of the tables is identifying a nominal rated voltage or the peak maximum operating voltage for the devices.  Nor is there any indication that the

50

breakdown voltage of the weakest electrode could not operate at any *maximum* voltages above those voltages reported in the tables.

Finally, CAP-XX provides no description of, or argument in support of, its construction for "maximum operating voltage of the cell" with respect to its proposed "the packaged cell" language. CAP-XX's reliance on the Court's previous construction does nothing to support such an inclusion, as the Court has never construed the full phrase presently in dispute. The claim language doesn't say "the packaged cell" it merely recites "the cell." CAP-XX's attempt to limit the "maximum operating voltage of the cell" to only an undefined and injected "packaged cell" would nevertheless be contrary to the plain claim language of "the cell" as being a distinct structure exclusive of the "sealed package" and does not even comport with CAP-XX's own proposed construction for "the cell." Accordingly, CAP-XX's attempt to rewrite the claim from "the cell" to "the packaged cell," whatever that might mean, should be rejected.

Because Maxwell's construction is consistent with the claim language and the specification's definition for these disputed terms, the Court should adopt Maxwell's proposed constructions.

### 3. *Plaintiff's Reply Position*

CAP-XX proposes that the Court construe this term in the same manner as in the *Ioxus* case. *See* Exhibit C, p. 3. In response, Maxwell does not dispute that this

case involves the same patents and same asserted claims. Instead, Maxwell rehashes a bevy of arguments -- none of which warrant this Court reconsidering its prior construction of "maximum operating voltage." In essence, CAP-XX contends that the maximum *operating* voltage is the maximum voltage at which the device can operate normally, just as the Court properly found in the *Ioxus* case. In contrast, Maxwell's contention is that the maximum operating voltage is instead the *minimum* voltage at which the device will *stop* operating. This is a critical distinction, as EDLC producers, including Maxwell and CAP-XX, commonly specify maximum operating voltages before the breaking point of its devices, in order to provide a margin of safety. *See* Exh. K., pp. 4-5 indicating the nominal and peak voltage limits for products, and p. 13 noting that use over the rated voltage may cause swelling and product failure.

In its Response, Maxwell denies that the Court previously construed the above terms, arguing that it did not construe "maximum operating voltage of the device" or "maximum operating voltage of the cell". Section VI.D.2 *supra*, p. 51. This argument is a distinction without a difference. Maxwell offers no basis for concluding that the meaning of "maximum operating voltage" changes at all, regardless of whether it is followed by "the device" or "the cell". Indeed, Maxwell's proposed construction is the same in both instances. This Court construed the term at issue – Maxwell's argument to the contrary is baseless.

Maxwell also argues that "maximum operating voltage" is defined in the specification. Section VI.D.2 *supra*, pp. 46-47. This argument is equally meritless. Maxwell cites to a portion of the specification which explains that the "maximum capacitor voltage" is essentially the "breakdown voltage of the weakest electrode." '034 patent, 22:46-54. As discussed above, one of the benefits of capacitors is their "high degree of recyclability," meaning that they can be used for hundreds of thousands of charge/discharge cycles. Exh. K, p. 6. Hence, as construed by this Court, the "maximum operating voltage" is a voltage at which the device or cell is designed to operate under normal conditions, *i.e.*, for hundreds of thousands of cycles, and not as argued by Maxwell, under conditions that would equal the breakdown voltage of the weakest electrode. In addition, the Court's construction is consistent with the technical definition for "rated voltage" cited by CAP-XX, which, first, defines it as the voltage at which a device is designed to operate under normal conditions; and second, defines it as the maximum voltage at which a device is designed to operate for an extended period without undue degradation. *See* Exh. E, JA11. Both of those definitions are consistent with the maximum operating voltage being the voltage at which the capacitors are designed to operate under normal conditions, for hundreds of thousands of cycles without degrading the electrodes therein.

Maxwell also disputes that the terms "rated voltage" and "maximum operating voltage" are used synonymously in the patents-in-suit. Section VI.D.2 *supra*, pp. 49-50. The intrinsic record belies that argument. The specification explains that Figure of Merit ("FOM") is calculated using the rated voltage represented by a capital "V". '034 patent, 16:53-59. The parties agreed to a construction of Figure of Merit, where it is calculated using the same rated voltage. *See* D.I. 59, pp. 7-8. Tables 17 and 20 of the patents-in-suit use the same rated voltage "V" for various charge storage devices to calculate their FOM and power maximum ("Pmax"). Maxwell does not contest that the same Voltage V is used in both calculations. Rather, it argues that the patents-in-suit do not identify what "voltage V" is represented in those tables. Section VI.A.2 *supra*, pp. 50-51. Not so. As discussed above, the same capital "V" is used in the calculations of FOM and Pmax in the patents-in-suit, and there is no reason to conclude that it would be different in those tables. *See* '034 patent, 16:53-59 and 26:20-30.

In addition, the example supercapacitors described in the specification identify the rated voltages for those devices, which are represented in those tables. *See* '034 patent, 22:62-26:6. For example, the supercapacitor described as Example 1 has a rated voltage of 2.5 Volts, capacitance of 270 Farads, mass of 295 grams, gravimetric FOM of 2.2 and volumetric FOM of 1.6. '034 patent, 23:46-51. That device corresponds to Item 15 on Table 17. Similarly, Example 2 has a rated voltage

of 2.5 Volts, capacitance of 30 Farads, mass of 25 grams, gravimetric FOM of 2.71, and volumetric FOM of 2.71. That device corresponds to Item 14 on Table 17. In short, the intrinsic record demonstrates that the patents-in-suit use the terms rated voltage and maximum operating voltage synonymously. Maxwell's argument to the contrary is without support.

In short, this Court previously construed the term "maximum operating voltage," and Maxwell's rehash of unsupported arguments do not warrant reconsideration of that construction here.

### 4.    *Defendant's Sur-Reply Position*

Maxwell's constructions, which have been further clarified herein, give meaning to the distinction between the "maximum operating voltage of *the cell*" and the "maximum operating voltage of *the device*" and follow the explicit definition and undisputed teachings of the intrinsic record.

Contrary to CAP-XX's assertions, these full terms were not previously construed by the Court and the "maximum operating voltage" does in fact change depending on the context—i.e., between "the cell" and "the device." It is not "baseless." (Page 52, *supra*.) For example, Figure 18 discloses a two-cell, four-electrode device wherein the "cells are defined by the respective opposed and adjacent carbon coatings" on the electrodes:



cell-1

cell-2

**FIG.18**

('034 patent, Fig. 18 (annotated), 25:26-34.)

The electrodes of cell-1 are thicker than cell-2. The patents-in-suit expressly teach that "[a] higher operating voltage can be achieved . . . by using different carbon loading on each electrode." (*Id.*, 22:46-54; Pages 44-45, *supra*.) Consequently, the patent explicitly teaches that the maximum operating voltage of cell-1 and cell-2 are different because they have different carbon loadings on their respective electrodes. That is, different cells can have different maximum operating voltages. This further demonstrates why the Court must construe the "maximum operating voltage" of either "the cell" or "the device" separately to account for the

differences in their defined structures in the patent and within the specification.

CAP-XX's opening brief admitted that the specification provides a definition for maximum operating voltage. (Pages 44-45; *see also* pages 46-47, *supra*.) CAP-XX now contradicts itself by contending that such an assertion is "meritless." (Pages 52-53, *supra*.) It is not. In fact, CAP-XX's reply further concedes that the specification of the patent-in-suit "explains" that "maximum operating voltage" is the highest voltage "without degrading the electrodes." (*Id.*) CAP-XX's proposal relying on the purported "rated voltage" of *a device* is incorrect because CAP-XX never indicates that any such commercially reported voltages are based on the breakdown of the weakest electrode, as opposed to some other aspect of the device that is not mentioned in the intrinsic record.

Maxwell's proposed construction, however, follows the express and undisputed teaching of the patents-in-suit by requiring that the "maximum operating voltage" of either "the cell" or "the device" based on "the highest potential operating voltage that does not break down the weakest electrode of the ['cell / 'the device']." Moreover, construing the "maximum operating voltage of the cell" with respect to the weakest electrode within the cell, as opposed to some other potentially limiting feature of an overall device that CAP-XX may otherwise seek to improperly rely on, is consistent with the claim language and specification's definitions that "the cell" does not include an electrolyte or the sealed package.

CAP-XX's other arguments are not availing because they are not consistent with the teaching of the intrinsic record.  First, CAP-XX acknowledges that capacitor devices have different nominal and peak voltages, but never provides any explanation or record citation to the specification that would somehow exclude operation at "peak voltage" from the "maximum operating voltage."  To the contrary, CAP-XX itself refers to the "peak voltage" as a "rated peak" voltage.  (Ex. K at 13.)

Second, CAP-XX alludes to the fact that some capacitors can be "used for hundreds of thousands of charge/discharge cycles."  (Page 53, *supra*.)  But there is no requirement in the claims or intrinsic record for any arbitrary number of cycles onto the distinctly claimed "cells" or "devices"; doing so would not be possible considering that the degradation of capacitors depends on numerous factors left unaddressed by the patents-in-suit.

Third, as described in Maxwell's responsive brief, capacitors operate under many different "conditions" including wide ranges of temperature, operating environments, and potential operating voltages. CAP-XX never specifies what it contends are the "*normal* conditions."  (*See* pages 8-10, 48-50, *supra*.)

Fourth, CAP-XX cannot substantiate its assertions regarding the disclosures of the patents-in-suit.  For instance, CAP-XX contends that "Example 1" corresponds to "Item 15 in Table 17."  (Page 54, *supra*.)  It does not.  The reported

volumetric FOM and capacitance values are different (*e.g.*, FOM of 1.6 and 1.83).

Furthermore, there is no evidence to show that the voltage reported in Table 17 is a "rated voltage," whether that voltage is a "rated peak" voltage or some other "rated" voltage, nor that the reported voltage was actually used to calculate the FOM. (*See id.* at 54-55.)  The data reported in Table 17 do not correspond to the reported FOM values or for the "Examples."  The examples identify a voltage, capacitance, and mass, and further state "[u]tilizing ***these figures***, in combination with a measure $T_0$" the gravimetric FOM is calculated.  (*E.g.*, '034 patent, 23:45-51.)  However, it cannot be disputed that utilizing the "figures" in the examples to calculate the gravimetric FOM results in different values from those reported in Table 17.  Thus, contrary to CAP-XX's assertion, there are reasons to conclude that the voltage value in Table 17 is not the "rated voltage" used to calculate FOM.  (Ex. K at 13.)

### E.    "Charge Storage Cell"

| Claim Term | Claim Numbers | Plaintiff's Construction | Defendant's Construction[11] |
|---|---|---|---|
| "charge storage cell" / "cell(s)" / "the cell" | 034 patent, cls. 1, 13, 23, 34, 42, and 51 | A structure for storing a charge having at least two opposing electrodes with a separator between them. | The structure associated with two opposing electrodes and a separator between them that <u>is capable of storing</u> charge (but does not include the |

---

[11] Maxwell slightly modified its construction of this term in its sur-reply and revisions are indicated in underline. Maxwell made this modification in response to CAP-XX's reply and in an attempt to clarify the disputes for the Court, as explained more fully below.

| | '600 patent, claim 3-5 | *See e.g.,* the '034 patent, Abstract; Figs. 2-6, 11A, 18, 19, and 21; 2:30-39; 3:11-14; 3:51-54; and 28:40-43. | receptacle/package containing the cell or an electrolyte).<br><br>*See e.g.,* the '034 patent 2:30-39; 3:11-17; 3:51-64; 9:18-42; 10:50-11:6; 11:14-22; 13:51-14:4; 14:21-32; 20:16-18; 25:33-37; 25:61-62; 28:30-46; 29:63-30:5; '072 patent, cls. 15, 19, 21, 27, 42, 43, 49, 55 |

### 1.    *Plaintiff's Opening Position*

CAP-XX's proposed construction is based on the plain language of the asserted claims and specification of the patents-in-suit.  By way of example, claims 13 and 34 quoted above recite that the cell includes the electrodes and the porous separator placed between them.  Similarly, with respect to Figure 21 referenced above, the specification explains that the electrodes and separator between them form a single capacitive cell.  *See* Exh. A, the '034 patent, 28:40-43.

Maxwell's proposed construction is too wordy and confusing.  Its inclusion of the phrase "structure associated with" is misleading, as it suggests that something else comprises the cell, and the electrodes and separator are merely "associated with" that other (yet to be defined) thing.  In addition, Maxwell's inclusion of the parenthetical "(but does not include the receptacle/package containing the cell or an electrolyte)" is unnecessary, as the Court is separately considering the construction

of those terms, and the parties do not dispute the contents of the sealed package, as discussed above, which are also expressly recited in the asserted claims.

Moreover, Maxwell's phrase "a separator between them that stores charge" is also misleading, as the specification of the patents-in-suit expressly states, as discussed above, that the charge is stored on the electrodes.

In sum, CAP-XX's construction of the term, "charge storage cell" is correct, as it is consistent with the claim language and specification.

### 2.    *Defendant's Answering Position*

Maxwell's construction of "charge storage cell" is more appropriate in light of the intrinsic evidence which makes clear that the claimed "charge storage cell" does not include the electrolyte and sealed package. CAP-XX does not dispute Maxwell's construction with respect to the "cell" being limited to the two opposing electrodes and a separator, but merely asserts the parenthetical—("but does not include the receptable/package containing the cell or an electrolyte")—is unnecessary. Yet, because the asserted claims recite a "charge storage cell" that is separate and distinct from the "package" and "an electrolyte," and that the "cell" is defined within the specification as solely being the two electrodes and the porous separator, Maxwell's parenthetical is correct and necessary to inform the jury of the proper meaning of the term and to ensure that CAP-XX does not attempt to derogate

from the recited claim language and definitions within the specification as to the term's scope.

Maxwell's construction is fully supported by the claim language. For instance, independent claim 1 of the '034 patent recites, in relevant part, the following:

> a charge storage cell including:
>   (a) a first electrode;
>   (b) a second electrode being opposed to and spaced apart from the first electrode; and
>   (c) a porous separator disposed between the electrodes;
> a sealed package for containing the cell and an electrolyte in which the cell is immersed; and . . .

('034 patent, cl. 1; *see also id.* cls. 13, 23, 34, 42, 51.)  Because each of the independent claims separately recite "the cell" and "a sealed package for containing the cell and an electrolyte in which the cell is immersed," the claim language itself expressly defines what a "cell" includes and what it does not include—i.e., it has two opposing electrodes with a separator between them, but distinctly does not include the electrolyte (in which the cell is immersed) or the sealed package (in which the cell can be contained). Indeed, if the "cell" were to include both the "sealed package" and "an electrolyte" these additional limitations of the claims would be redundant and superfluous.  But that language is not superfluous.  Rather, the additional language expressly clarifies that "the cell" is defined separately from the "sealed package" and "an electrolyte." *See Bio-Rad Labs., Inc. v. Int'l Trade Comm'n*, 998 F.3d 1320, 1331 (Fed. Cir. 2021) ("Inventors are masters of their

claims, and the words they use to describe and claim their invention are decisive and binding.").

The claim language defining the "cell" as merely two electrodes and a porous separator—to the exclusion of an electrolyte and package—is further demonstrated by the specification's definition of "a cell." For example, the specification expressly discloses that "the electrode pair show in FIG. 19 is defined as a cell." ('034 patent, 25:61-62.) Figure 19 depicts the "cell" which only includes the two opposing electrodes 100 and 103 and a separator 54:



('034 patent, Fig. 19, 25:61-62; *see also id.* 28:40-42 ("This ***electrode and separator combination*** is then inserted into the folded electrode 304 ***to complete a single capacitive cell***.") (emphasis added).) The specification repeats this same definition of the "cell" in various places: "the first electrode and the second electrode form a capacitive cell." ('034 patent, 2:30-31, 3:11-12, 3:51-52; *see also id.*, 25:33-34 ("In this case, a cells are [sic] defined by the respective opposed and adjacent

63

[electrodes].").  CAP-XX itself agrees that "the electrodes and separator between them form a single capacitive cell," consistent with Maxwell's proposed construction.  (*See* page 60, *supra*.)  Accordingly, a person of ordinary skill in the art reviewing the claim language and the specification would have understood that the claimed "charge storage cell" or "the cell" refers to structure associated with two opposing electrodes and a separator between them that stores charge (but does not include the receptacle/package containing the cell or an electrolyte).

CAP-XX's remaining arguments concerning Maxwell's construction are without merit. The use of "associated with" merely indicates that the claimed "cell" is the combination of the two electrodes and separator together.  Contrary to CAP-XX's conclusory assertion, there is nothing misleading about the language in Maxwell's construction.  Conversely, however, CAP-XX's proposal that the "charge storage cell" is "a structure . . . having *at least* two opposing electrodes with a separator between them" seeks to do what CAP-XX (wrongly) accuses Maxwell's construction of doing—i.e., being misleading as to what other (yet to be defined) thing(s) it seeks to inject into the scope of "the cell" by including "at least" within its construction.  (*See* page 60, *supra*.)  This begs the question, what else does CAP-XX contend is included within the "at least" language of its proposed construction for "charge storage cell" when the specification and claims define the electrodes and

separator as the only structure that is part of "the cell" to the exclusion of the package and electrolyte?

Maxwell respectfully requests that the Court adopt its construction of "charge storage cell" / "the cell" as more accurate, consistent with the claim language and intrinsic record, and will better inform a jury of the meaning of this claim term.

### 3.    *Plaintiff's Reply Position*

CAP-XX's proposed construction is based on the plain language of the asserted claims and specification of the patents-in-suit.  Maxwell's only complaint about CAP-XX's proposed construction is that it includes the phrase "at least" and does not describe what other components may be included in a cell.  Section VI.E.2 *supra*, p. 64, p. 11.  CAP-XX's construction is correct, as the asserted claims recite a charge storage cell "including" electrodes and separators, which is open ended and not limiting.  *See e.g.,* '034 patent, 31:28-34.  Indeed, Maxwell made the opposite argument in response to CAP-XX's proposed construction for "charge storage device".  *See* Section VI.F.2 *supra*, pp. 71-72. Such tactics demonstrate the speciousness of Maxwell's argument and that its dispute of this term is not a judicious use of the parties' or this Court's resources.

As discussed above, the claim terms "sealed package" and "electrolyte" are being separately construed.  CAP-XX maintains that the negative parenthetical in Maxwell's proposed construction is redundant and its inclusion of the term

"associated with" is unnecessary and confusing, for the same reasons as set forth in CAP-XX opening brief.

### 4.    Defendant's Sur-Reply Position

Maxwell's proposed construction of "charge storage cell" remains more appropriate considering the intrinsic evidence.  The parenthetical within Maxwell's construction is necessary to explain what is *not* included in "the cell" based on the claim language and specification.

The construction of "charge storage cell" should include both what is included within the cell and what is not included.  According to the asserted claims, the cell includes only the structure associated with the electrodes and separator, but not the packaging or electrolyte. (*E.g.,* '034 patent, cl. 1.)   CAP-XX recognizes this distinction by repeatedly referring to the cell, package, and electrolyte as separate components of the charge storage device in its Reply. (*See* pages 39-40, *supra* (describing the cell as a "component" and noting the "electrolyte *in which the cell is immersed*").)

Despite conceding that the cell does not include the packaging or electrolyte, CAP-XX argues Maxwell's proposed parenthetical is unnecessary because the terms "sealed package" and "electrolyte" are being separately construed. (*Id.* at 65.)  These terms' constructions, however, do not make clear that they are not included within

the charge storage cell; therefore, Maxwell's proposed construction remains necessary.

Unlike Maxwell's proposed construction which clarifies precisely what is included in a "charge storage cell," CAP-XX's proposed construction is unduly vague by using the words "at least." CAP-XX fails to explain what is meant by "at least" and what other components—beyond the electrodes and separator—are included within its construction of "the cell." Indeed, CAP-XX consistently describes the cell as *only* including the two opposing electrodes and a separator. (*See id.* at 39-40.)

CAP-XX argues that the words "at least" are appropriate because the claim language uses the open-ended term "including" to define the charge storage cell. (*Id.* at 65.) Maxwell's proposed construction allows for this open-ended language by reciting "the structure associated with" the electrodes and separator and does not allow for other components to be pulled into the meaning of "the charge storage cell" which may be improperly included under CAP-XX's proposal. For example, Figure 5 of the '034 patent depicts rectangular tabs 57 and 58 which "are integrally formed with and upwardly extend from" the electrode sheets. ('034 patent, 23:9-11.)



**FIG. 5**

(*Id.*, Fig. 5.) Maxwell's proposed construction of "the structure *associated with*" the electrodes and separator properly accounts for these associated structures to give proper meaning to the open-ended nature of the claim language, without leaving all other structures of a device to be part of "the cell." (*See also* '034 patent, 9:20-21 (discussing "two cell terminals" that are part of the structure associated with the cell).)

Lastly, Maxwell has slightly modified its proposed construction to recognize that the cell "is capable of storing charge," instead of merely stating the cell "stores charge" as previously proposed. This modification should not be controversial. CAP-XX acknowledges that electrodes do not always "store charge," but are *capable of* doing so. (Pages 20-21, *supra*.) Similarly, the structure that constitutes "the cell" need not store charge, but merely be *capable of* storing charge.

68

### F.    "Charge Storage Device/Device"

| Claim Term | Claim Numbers | Plaintiff's Construction | Defendant's Construction |
|---|---|---|---|
| "charge storage device" / "the device" | the '034 patent, cls. 1, 13, 23, 34, 42, and 51<br><br>'600 patent, claim 1 | No construction necessary, as the preamble does not limit the scope of the claim.<br><br>Alternatively, a structure for storing a charge having the components and other elements recited in the claim.<br><br>*See e.g.,* the '034 patent, Abstract, Figs. 2-6, 11A, 18, 19, and 21; 2:7-22; 16:27-42; 28:12-20. | A component of or an entire piece of equipment that stores electrical charge.<br><br>*See e.g.,* the '034 patent 1:12-20; 2:30-39; 3:11-17; 3:51-63; 31:1-22; U.S. Patent No. 6,631,072 ("'072 patent"), cls. 15, 19, 21<br><br>The preamble is limiting |
| "device" | All Asserted Cls. | No construction necessary, as it merely refers to the "charge storage device" recited in the preamble of the claim.<br><br>Alternatively, a structure for storing a charge having the components and other elements recited in the claim.<br><br>*See e.g.,* the '034 patent, Abstract; Figs. 2-6, 11A, 18, 19, and 21 | A component of or an entire piece of equipment that performs a specifically defined function.<br><br>*See e.g.,* the '034 patent 1:13-20; 2:30-39; 3:11-17; 3:51-64 |

### 1.    Plaintiff's Opening Position

This term "charge storage device" appears in the preamble of each of the asserted claims.  It does not provide additional limitations beyond the limitations recited in the body of each claim; and thus, CAP-XX urges that no further construction is warranted. *See Catalina Mktg. Int'l,* 289 F.3d at 808; *see also Pitney Bowes*, 182 F.3d at 1305.  Referring back to asserted claims 13 and 34 above, they both refer to a "charge storage device" in the preamble, and then refer to a "charge storage cell" in the body of those claims, and then describe the elements of "the cell" thereafter.  Hence, the term "charge storage device" in the preamble does not provide any additional structure or limitation not otherwise found in the body of the asserted claims.

Alternatively, if these terms are construed, CAP-XX urges that the Court adopt its construction, which is consistent with the plain language of the asserted claims.  Referring back to claims 13 and 34 quoted above, the term "device" merely refers back to the "charge storage device" recited in the preamble of those claims.  Hence, CAP-XX's proposes the construction "a structure for storing a charge having at least the components and other elements recited in the body of the claim."

With regard to Maxwell's proposed construction, the phrase "a component of or an entire piece of equipment" is misleading.  Each of the asserted claims recites a charge storage device in the preamble, and not a charge storage device as part of

some larger "piece of equipment."    Hence, Maxwell's proposed construction mischaracterizes the scope of the asserted claims suggesting, in part, that they recite a charge storage device that is merely a "component" of a larger "piece of equipment," which is not correct for any of the asserted claims.

CAP-XX urges that no construction is warranted or, alternatively, that its proposed construction is correct, as it is consistent with the plain language of the asserted claims.

### 2.    *Defendant's Answering Position*

Maxwell's construction clarifies the meaning of "charge storage device" / "the device" in accordance with the intrinsic evidence and is consistent with the plain meaning of "device." A construction of the "charge storage device" term is necessary because the preamble is limiting and required to give meaning to "the device" recited in the body of the claim, as explained more fully below.

First, the preamble of every independent claim of the asserted patents generically recite "[a] charge storage device" followed by an open transition word "comprising" / "including." (*See* '034 patent, cls. 1, 13, 23, 34, 42, 51; '600 patent, cl. 1.) Each of these claims also recite "the device" within the body of the claims. (*See id.*) The sole term that can provide the requisite antecedent basis for the recitation of "the device" within the body of the claims is the "charge storage device." CAP-XX likewise admits that "the term 'device' merely refers back to the

71

'charge storage device' recited in the preamble of those claims." (Page 70, *supra*.)
Therefore, because the preamble's "charge storage device" is the only claim
language that could supply the antecedent basis for "the device" recited in the claim,
the preamble is necessarily limiting. *See Shoes by Firebug*, 962 F.3d at 1368 (finding
antecedent basis renders a preamble limiting where "the preamble is essential to
understanding the structural limitations of the [] system").

Moreover, the case law cited by CAP-XX underscores the limiting nature of
the preamble. In the asserted independent claims there can be no reasonable question
that the "charge storage device" is an "essential structure" since the metes-and-
bounds of that "device," to the extent they can be determined with definiteness, must
be precisely defined in order to assess other requirements of the claims. *Catalina
Marketing*, 289 F.3d at 808. For example, the claims require "volumetric" or
"gravimetric" determinations based on the volume or mass of what constitutes the
claimed "charge storage device" because the volume or mass of "the device" is what
is used in the denominator of the functionally recited "FOM" and "power maximum"
elements of the claims. Accordingly, the "charge storage device" within the
preamble is "'necessary to give life, meaning, and vitality' to the claim" with respect
to "the device." *Id.* (quoting *Pitney Bowes*, 182 F.3d at 1305); *see also In re Packard*,
751 F.3d 1307, 1310, Appendix I (Fed. Cir. 2014).

Second, Maxwell's construction allows for the possibility made apparent in the intrinsic record that a "charge storage device" may refer to a component of or an entire piece of equipment. As recited in the independent claims, a "charge storage device" is satisfied by only a single "cell." (*See, e.g.,* '034 patent, cl. 1.) Dependent claims recite "a plurality of cells," requiring at least two "cells," which may be connected in different configurations (i.e., in series or parallel). (*See, e.g.,* '034 patent, cls. 9-11, 2:30-34, 3:11-14; *see also* '072 patent, cls. 15, 21 (defining a "storage device" as including one cell or more than one cell).) In the same way that a single cell or multiple cells can be part of "the device," multiple "devices" can be connected in series or parallel to provide higher capacitances and higher voltages. (*See* '034 patent, 2:36-39.) For example, the specification states that an electrochemical supercapacitor is a type of "charge storage device" that consists of at least one cell. (*See, e.g.*, '034 patent, 1:12-20; '072 patent, cl. 19.) Multiple "devices" may be combined to form a single larger "device," and in such case each of the individual component "devices" and the overall larger "device" can both satisfy "the device" under the asserted claims. (*See* '034 patent 31:1-22 (acknowledging larger versus smaller devices and the effect on performance characteristics).)

Third, CAP-XX's construction seeks to impermissibly narrow the claimed "charge storage device" to *only* include the elements recited in the claim language.[12] Independent claim 1 recites "[a] charge storage device *comprising*" the subsequent claim limitations—it does not recite the closed transition "consisting of." ('034 patent, cl. 1 (emphasis added).) The use of "comprising" and "including" as the transition word in the asserted claims indicates that the claimed "charge storage device" is inclusive of other elements not expressly recited in the claims. *See Amgen Inc. v. Amneal Pharms. LLC*, 945 F.3d 1368, 1378-79 (Fed. Cir. 2020) ("The term 'comprising' is the standard transition term used to make clear that the claim does not preclude the presence of components or steps that are in addition to, though not inconsistent with, those recited in the limitations that follow."). A "charge storage device" may also include the various features required to connect cells in series or parallel or additional protective cladding or insulation (e.g., for safety) that go beyond the limitations expressly recited in the claims. Because CAP-XX's "no construction necessary" position seeks to restrict the "charge storage device" / "the device" to *only* the expressly recited claimed elements—as if the claims recite the

---

[12] CAP-XX submits a new proposed construction for this term in its opening brief, which is materially different from that it previously proposed in the Joint Claim Construction Statement.  Prior to its opening brief, CAP-XX recognized that the open "comprising" transition meant that the "charge storage device" had "at least" the recited components—i.e., it was not strictly limited to *only* the recited components."

transition "consisting of" instead of "comprising" / "including"—its construction should be rejected.

Finally, Maxwell's construction for "charge storage device" more accurately reflects the ordinary meaning of a "device"—i.e., a component of or an entire piece of equipment that performs a specifically defined function—in light of the claims and specification. (*See* Ex. H, Merriam-Webster Dictionary definition of "device," *available at* https://www.merriam-webster.com/dictionary/device (device: "a piece of equipment or a mechanism designed to serve a special purpose or perform a special function").) Maxwell's construction reflecting "a component of or an entire piece of equipment" is substantively similar to CAP-XX's alternative proposal that the "charge storage device" refers to "***structure* . . . *having at least*** the components or other elements recited in the body of the claim," but merely defines the purported "structure . . . having at least" in the context of "a component of or an entire piece of ***equipment***," per the plain meaning of a "device." Accordingly, Maxwell's construction should be adopted.

### 3. *Plaintiff's Reply Position*

This term "charge storage device" appears in the preamble of the asserted claims. The words "charge storage" merely state the purpose of the device; hence, they do not provide additional limitations beyond those recited in the body the claims themselves. By way of example, the body of claim 1 recites a structurally complete

invention that includes: (i) a "charge storage cell" comprised of electrodes and a separator; (ii) a sealed package for containing the cell and an electrolyte; (iii) terminals that extend from the sealed package; and (iv) limitations on the Figure of Merit and maximum operating voltage for that device. The reference to "charge storage device" in the preamble does not further limit the claim, as the claim recites the "charge storage" element in its body and the recited components thereof are contained within a sealed package or extending therefrom in the case of the terminals. A skilled artisan would understand that the sealed package and components thereof represent the "device". Hence, CAP-XX urges that no further construction is warranted for "charge storage device." *See Shoes by Firebug LLC v. Stride Rite Children's Grp., LLC*, 962 F.3d 1362, 1367-1368 (Fed. Cir. 2020) (finding the preamble not limiting where body of the claim recites a structurally complete invention); *Mondis Tech. Ltd. v. LG Elecs., Inc.,* C.A. No. 15-4431 (SRC), 2017 U.S. Dist. LEXIS 163884, *5 (D.N.J. 2017) (finding that the preamble need not be construed where it does not add any unique content to the information in the body of the claim).

Maxwell's proposed construction reinforces this conclusion. For the phrase "charge storage," Maxwell's construction shows that it merely states the intended purpose of the "device," that is, it "stores electrical charge." Where the preamble merely restates the intended purpose of the claimed invention, it is not limiting and

need not be construed.  *See Catalina Mktg. Int'l v. Coolsavings.com, Inc.,* 289 F.3d 801, 809-810 (Fed. Cir. 2002) (finding the preamble not limiting, even when providing antecedent basis for a claim element, where the specification and prosecution history do not employ the preamble to limit the invention, and it merely states the intended use of the invention).

Similarly, Maxwell's proposed construction for "device" does nothing to give meaning to the limitations in the body of the claim.  Indeed, if anything, it contradicts them.  While Maxwell argues that "the preamble is limiting" in the table above, its proposed construction is anything but limiting.  Maxwell's proposes that "device" means "a component of or an entire piece of equipment".  The asserted claims recite a sealed package for containing the other components recited in the claims, as discussed above.  Hence, the express language of the asserted claims refers to a self-contained charge storage device.  None of the asserted claims recite a "system" or "equipment" of which the "charge storage device" is merely a component.  Hence, Maxwell's proposed construction is contrary to the express language of the claims.  It does not give life, meaning or vitality to the claims, but rather, sows ambiguity and confusion with an overly broad construction.

In addition, Maxwell argues that "charge storage device" must be construed because the mass/volume of the "device" is used to calculate FOM limitations in some of the asserted claim.  Section VI.F.2 *supra*, p. 72. This argument is a red

herring. As discussed above, the asserted claims recite a packaged device, and a skilled artisan would understand how to calculate the mass and volume thereof. Importantly, Maxwell's proposed construction does not employ the phrase "charge storage" to limit its proposed construction of "device;" to the contrary, Maxwell seeks an overly broad construction for "device," so that it can later argue that FOM is indefinite because it is unclear where the boundaries of the "entire piece of equipment" reside; hence, it is unable to determine the "mass" or "volume" thereof. Alternatively, it may provide Maxwell latitude to include the mass/volume of an "entire piece of equipment" in the denominator when calculating FOM, to argue that its capacitors are not covered by the asserted claims because they are used as part of a larger piece of equipment and the FOM of that equipment (in its entirety) is not covered by an asserted claim. As discussed above, Maxwell's proposed construction of "device" contradicts the plain language of the claims and should be rejected.

Further, Maxwell's argument that "charge storage device" in the preamble must be construed because it provides the antecedent basis for "device" in the body of the claims has been previously rejected in this District. *See Sentient Sensors, LLC v. Cypress Semiconductor Corp.*, No. 19-1868 (MN), 2021 U.S. Dist. LEXIS 93222, *4 (D. Del. 2021) (rejecting the proposition that a term recited in the preamble that provides antecedent basis for an element in the body of a claim must be construed).

Finally, Maxwell argues that CAP-XX's proposed construction is too narrow because the claims employ the word "comprising/including," which is not limiting on the claims, as discussed above.  Section VI.F.2 *supra*, pp. 71-72.  In response, CAP-XX modified its proposed construction to recite "having *at least* the components" as shown above, which should resolve Maxwell's concern.

### 4.    *Defendant's Sur-Reply Position*

Maxwell's proposed construction of "charge storage device" clarifies its proper meaning as described in the asserted claims and specification.  The preamble of the asserted claims is limiting in that the recited "charge storage device" is an essential, structural component that gives meaning to the claims, as opposed to an intended use.  *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002).  Furthermore, "dependence on a particular disputed preamble phrase for antecedent basis may limit claim scope because it indicates a reliance on both the preamble and claim body to define the claimed invention."  *Id.*  Here, "the preamble is essential to understanding the structural limitations" of the device.  *Shoes by Firebug LLC v. Stride Rite Children's Grp., LLC*, 962 F.3d 1362, 1368 (Fed. Cir. 2020).

Maxwell's proposed construction accounts for the various configurations of the claimed "charge storage device" as described in the asserted claims and patent specification.  Despite CAP-XX's assertion that the "express language of the claims"

does not include device components, the asserted claims include both single-cell and multiple-cell devices. (Page 77, *supra*; *see also, e.g.,* '034 patent, cls. 1 and 9.) Accordingly, the asserted claims anticipate that a charge storage device could be comprised of multiple, single-cell devices (components), connected in series and/or parallel to form a larger, operable device. Unlike Maxwell's construction, CAP-XX's construction does not account for the multitude of device configurations that are contemplated by the asserted claims. Yet, contrary to its assertions here, before the patent office CAP-XX argued that "the device" means the "<u>entire operable device.</u>" (Ex. L at 11.)

Although CAP-XX modified its proposed construction to include "at least" the components and elements in the claim language, that construction remains ambiguous. Maxwell's construction describing a device as "a component of or an entire piece of equipment" is more accurate.

### G.    "Figure of Merit"

| Claim Term | Claim Numbers | Plaintiff's Construction | Defendant's Construction |
|---|---|---|---|
| "Figure of Merit" | '034 patent, cls. 1, 4-7, 13, 51, 54-57<br><br>'600 patent, cls. 1, 2, 7 | No separate construction necessary. | A quantity used to characterize the performance of a device. |

### 1.    *Plaintiff's Opening Position*

CAP-XX's position is that no further construction of Figure of Merit is warranted. The parties agree upon the construction of the terms "quantitative Figure of Merit" and "volumetric Figure of Merit," which are essentially the same as the constructions adopted by this Court in the *Ioxus* case. *See* D.I. Doc. 59, pp. 5-6; *see also* Exh. C, p. 1-2. None of the asserted claims recites Figure of Merit, *alone*; rather, they only recite "volumetric Figure of Merit" or "gravimetric Figure of Merit," and the parties agree to the constructions of those terms. In addition, those agreed constructions necessarily include a construction for Figure of Merit, as the parties agree that the "volumetric Figure of Merit" and "gravimetric Figure of Merit" of a device are determined by dividing the calculated Figure of Merit by the volume or mass of that device, respectively. *See* D.I. 59, pp. 5-6.

Moreover, Maxwell's proposed additional gloss that Figure of Merit is "used to characterize the performance of a device" does nothing to further define the scope or meaning of the claims; rather, it is Maxwell's argument regarding the factual issue of how Figure of Merit is used. Essentially, Maxwell is asking this Court to make that factual determination on an incomplete record and as a matter of law. Without expressly so stating, Maxwell is arguing its invalidity defense that the asserted claims allegedly lack patentable subject matter. *See* Exh. E, Defendant Invalidity Contentions, pp. 9-10. Maxwell will have ample opportunity to present expert or

81

fact witness testimony on this fact issue, which would be part of a more complete record available to the Court and jury, when Maxwell's invalidity defenses are considered later in the case.

For the foregoing reasons, no further construction of Figure of Merit is warranted, given the agreed constructions for volumetric and quantitative Figure of Merit.

### 2.    *Defendant's Answering Position*

A purpose of claim construction is to assist juries in understanding technical terms. *Control Res., Inc. v. Delta Elecs., Inc.*, 133 F. Supp. 2d 121, 127 (D. Mass. 2001) ("In the end, claim construction must result in a phraseology that can be taught to a jury of lay people."). Maxwell's construction of "Figure of Merit" is necessary to aid a jury in understanding the claim language of the asserted patents. Even though the parties agreed to the separate gravimetric and volumetric figure of merit constructions, the term "Figure of Merit" is rampant in the asserted claims and the ordinary meaning of a "Figure of Merit" is likely unfamiliar to a layperson. In fact, "Figure of Merit" is not even a commonly used term within the scientific community as it relates to measuring supercapacitors and was never adopted as an industry standard. Maxwell's request to construe this term is not an attempt to resolve a factual issue, as CAP-XX suggests; rather, construction of this term is necessary so that its meaning is readily discernible by the fact finder.

Additionally, Maxwell's proposed construction of "Figure of Merit" is supported by the intrinsic record and not materially disputed by CAP-XX. The patent claims and specification do not shed light on what constitutes a "Figure of Merit" and merely refer to it as something "used to characterise the present invention" and "a parameter directly relevant to such applications." ('034 patent, 17:14-18.) The asserted patents do, however, incorporate by reference John R. Miller's paper entitled "Pulse Power Performance of Electrochemical Capacitors: Technical Status of Present Commercial Devices," which does provide an explanation of the "Figure of Merit." (*See, e.g.,* '034 patent, 16:63 – 17:7; *see also* Ex. G, Miller paper.) The Miller paper, which is part of the intrinsic record,[13] describes the "Figure of Merit" as a value used to measure electrical and power performance of "technologies and products." (Ex. G at 4-5.) Thus, the intrinsic record supports Maxwell's construction of "Figure of Merit" as "[a] quantity used to characterize the performance of a device."[14]

Maxwell respectfully requests that the Court adopt Maxwell's construction of "Figure of Merit."

---

[13] Because the Miller paper is incorporated by reference in the specifications of the asserted patents, it is considered part of the intrinsic record. *See Cook Biotech Inc. v. ACell, Inc.*, 460 F.3d 1365, 1376 (Fed. Cir. 2006).

[14] *See also* Wikipedia, The Free Encyclopedia – Figure of Merit, *available at* https://en.wikipedia.org/wiki/Figure_of_merit ("A figure of merit is a quantity used to characterize the performance of a device, system or method, relative to its alternatives.").

### 3.    *Plaintiff's Reply Position*

CAP-XX urges that no further construction of Figure of Merit is warranted, as the parties agreed upon the construction of this term, as part of their agreed constructions for "quantitative Figure of Merit" and "volumetric Figure of Merit," which are essentially the same as the constructions as adopted by this Court in the *Ioxus* case. *See* D.I. 59, pp. 7-8; *see also* Exh. C, p. 1-2. Maxwell nonetheless argues that a further construction is necessary because its agreed construction is too complicated to explain to a jury. Section VI.G.2 *supra*, p. 82. While this suit, like many patent cases, involves technology that may not be generally known to a lay person, Maxwell's proposed additional construction of Figure of Merit does nothing to further explain how that characteristic is determined based on the physical properties of a device. Rather, Maxwell seeks to have this Court decide an issue of fact as a matter of law, under the guise of claim construction. In short, no further construction is required, in light of the parties' agreed construction of this term, a construction previously adopted by this Court in the *Ioxus* case.

### 4.    *Defendant's Sur-Reply Position*

CAP-XX never disputes that a figure of merit is a quantity used to characterize the performance of a device. CAP-XX's only objection is that construing "figure of merit" is unnecessary. (Pages 83-84, *supra*.) However, Courts have previously construed specific formulas, while also construing the basic terminology associated

with those formulas to aid a jury. *See, e.g., Bd. of Regents of the Univ. of Tex. Sys. v. A123 Sys., Inc.*, No. 3:06-cv-1655, 2011 WL 1135115, at *8 (N.D. Tex. Mar. 29, 2011) (separately construing "formula," as well as additional phrases which also contained the word "formula"). Construction of the gravimetric and volumetric figures of merit does not preclude construction of "Figure of Merit."

Dated:  October 8, 2021

POTTER ANDERSON & CORROON LLP

By: */s/ Philip A. Rovner*
    Philip A. Rovner (#3215)
    Jonathan A. Choa (#5319)
    Hercules Plaza
    P.O. Box 951
    Wilmington, DE 19899
    (302) 984-6000
    provner@potteranderson.com
    jchoa@potteranderson.com

OF COUNSEL:
Chris P. Perque
Adam Yowell
Jason P. Mueller
FISHER BROYLES LLP.
2925 Richmond Ave, Ste. 1200
Houston, TX 77098
(832) 604-4417

*Attorneys for Plaintiff*
*CAP-XX, Ltd.*

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

By: */s/ Jeremy A. Tigan*
    Jack B. Blumenfeld (#1014)
    Jeremy A. Tigan (#5239)
    1201 N. Market Street
    P. O. Box 1347
    Wilmington, DE 19899-1347
    (302) 658-9200
    jblumenfeld@morrisnichols.com
    jtigan@morrisnichols.com

OF COUNSEL:

Heidi L. Keefe
Lam Nguyen
COOLEY LLP
3175 Hanover Street
Palo Alto, CA 94304-1130
(650) 843-5000

Adam M. Pivovar
Elizabeth Shrieves
COOLEY LLP
1299 Pennsylvania Avenue, NW,
Suite 700
Washington, DC 20004
(202) 842-7800

Erik Milch
Jennifer Volk-Fortier
COOLEY LLP
One Freedom Square
Reston Town Center
11951 Freedom Drive
Reston, VA 20190
(703) 456-8000

*Attorneys for Defendant*
*Maxwell Technologies, Inc.*