# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

CAP-XX, LTD.,                          )
                                   )
    Plaintiff,          )
                                   )   C.A. No. 19-1733 (CFC)
    v.                  )
                                   )
MAXWELL TECHNOLOGIES INC.,)
                                   )
    Defendant.          )
_____)

# DEFENDANT MAXWELL TECHNOLOGIES INC.'S BRIEF IN
# SUPPORT OF ITS MOTION #2 FOR SUMMARY JUDGMENT

FISH & RICHARDSON P.C.
Susan E. Morrison (#4690)
Grayson P. Sundermeir (#6517)
222 Delaware Avenue, 17th Floor
Wilmington, DE 19801
(302) 652-5070
morrison@fr.com
sundermeir@fr.com

Daniel R. Gopenko
FISH & RICHARDSON P.C.
1000 Maine Avenue, SW
Suite 1000
Washington, DC 20024
(202) 626-7745
gopenko@fr.com

Aamir A. Kazi
FISH & RICHARDSON P.C.
1180 Peachtree Street NE
21st Floor
Atlanta, GA 30309
(404) 724-2811
kazi@fr.com

Matthew Colvin
FISH & RICHARDSON P.C.
1717 Main Street
Suite 5000
Dallas, Texas 75201
(214) 292-4013
colvin@fr.com

*Attorneys for Defendant*
*MAXWELL TECHNOLOGIES, INC.*

Dated:  July 15, 2022

# **TABLE OF CONTENTS**

**Page(s)**

I. Introduction ................................................................................... 1

II. Nature and Stage of the Proceedings ........................................... 1

III. Summary of Argument ................................................................. 1

IV. Statement of Facts ....................................................................... 2

    A. Supercapacitors ................................................................... 2

    B. The Asserted Patents and Claims ....................................... 3

        1. The Asserted Claims Contain No Upper Limit and Claim All Power Performance Metrics Above the Limits in the Prior Art ....................................................................................... 3

        2. The "Theoretical" Upper Limit Is Not a Limit ..................... 4

    C. The Accused Products ......................................................... 5

V. Argument ...................................................................................... 5

    A. The Asserted Patents Are Invalid Due to Lack of Enablement ....... 5

        1. The Law of Enablement .......................................................... 6

        2. The Full Scope of the Asserted Claims Requires Power Performance Metrics Up to an Unknown Limit ................... 7

        3. The Asserted Patents Do Not Enable Unbounded Power Performance ........................................................................... 9

        4. The Asserted Patents Do Not Enable Reaching the "Theoretical" Maximum Power Performance Metrics ....... 10

    B. The Asserted Patents Are Invalid for Failing to Meet the Written Description Requirement .................................................. 17

VI. Conclusion ................................................................................. 19

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Idenix Pharms. LLC v. Gilead Scis. Inc.*,
    941 F.3d 1149 (Fed. Cir. 2019) ...................................................................15

*LizardTech, Inc. v. Earth Res. Mapping, Inc.*,
    424 F.3d 1336 (Fed. Cir. 2005) ...................................................................18

*MagSil Corp. v. Hitachi Glob. Storage Techs., Inc.*,
    687 F.3d 1377 (Fed. Cir. 2012) ............................................................*passim*

*Nuvo Pharms. (Ireland) Designated Activity Co. v. Dr. Reddy's Lab'ys Inc.*,
    923 F.3d 1368 (Fed. Cir. 2019) ...................................................................17

*In re Wands*,
    858 F.2d 731 (Fed. Cir. 1988) ..............................................................*passim*

**Statutes**

35 U.S.C. § 112 ...........................................................................................6, 17, 19

## I.     INTRODUCTION

The asserted claims of the '034 and '600 patents cover all possible improvements in supercapacitor power performance, however achieved.  The patents' specification, drafted in 1998, fails to enable or disclose all such improvements.  The asserted claims are thus fatally overbroad and invalid. Maxwell moves for summary judgment of invalidity due to lack of enablement and lack of written description.

## II.    NATURE AND STAGE OF THE PROCEEDINGS

CAP-XX accuses Maxwell of infringing claims 12, 16-18, 20, 22, 41, 43, 48-51, and 62 of the '034 patent and claims 8 and 9 of the '600 patent.  Fact and expert discovery are closed.  A pretrial conference is scheduled for October 13, 2022, and trial is set to begin on October 24, 2022.  (D.I. 24.)

## III.   SUMMARY OF ARGUMENT

1.     In an effort to capture all future improvements on supercapacitor technology, CAP-XX sought and acquired patent claims covering any supercapacitor with power performance metrics above certain thresholds.  The limited disclosure of CAP-XX's patents, which teach nothing about the improved supercapacitor component parts necessary to maximize power performance, do not support the broad claims.  Indeed, CAP-XX's own expert repeatedly testified that "luck" is required to build a device with higher power performance.  Luck, however, is insufficient to support patent claims.

2.     There can be no dispute that undue experimentation would be required for a person of ordinary skill in the art (POSITA) at the time of the invention to practice the full scope of the claims.  Similarly, the undisputed facts show that a POSITA would not reasonably believe that the inventors were in possession of the full scope of the asserted claims, as anyone would recognize that future research and development would increase power performance beyond the state of the art in 1998.  The asserted claims are invalid.

## IV.   STATEMENT OF FACTS

Maxwell relies on the numbered Facts in its Concise Statement of Facts, included with this filing.  The following facts provide useful context.

### A.   Supercapacitors

Supercapacitors (alternatively known as EDLCs or ultracapacitors) have been well known and in use for decades.  (Ex. 9, Hruska Opening ¶¶ 101-106.) They are devices that store electrical charge in a double layer at a surface-electrolyte interface, often including high-surface area carbon.  (*Id.* at ¶ 88.) Supercapacitors contain two electrodes separated by a porous, electrically insulating membrane (known as a "separator") saturated with an electrolyte. (*Id.* at ¶ 89.)  Connected to the electrodes are current collectors that extend to terminals, which enable electrical current to flow to and from the device.  (*Id.*) This structure is packaged into various geometric forms, including battery-style cans, button cells, or prismatic pouches.  (*Id.* at ¶ 90)  These basic, required

components of a supercapacitor were all well-known and conventional in 1998. (*See* Fact 17.)

### B.   The Asserted Patents and Claims

The asserted patents claim priority to a provisional patent application filed December 5, 1998.  The patents describe and claim generic supercapacitors that have certain power performance metrics that are "greater than about" certain values.  Figures of Merit ("FOMs") are calculated using data derived from specialized testing, while "Pmax" metrics use a traditional equation for calculating power.  (*See* Facts 7-10).

### 1.   The Asserted Claims Contain No Upper Limit and Claim All Power Performance Metrics Above the Limits in the Prior Art

Combined, the asserted patents contain 80 claims that cover supercapacitors with either a (1) volumetric FOM, (2) gravimetric FOM, (3) volumetric Pmax, or (4) gravimetric Pmax that is "greater than about" a particular value.  ('034 patent, cls. 1-52; '600 patent, cls. 1-18).  None of the asserted claims include an upper boundary on the FOM or Pmax (collectively, "power performance metrics") covered by the claim.  (Facts 11-13.)

The specification does not support such a broad claim scope, and instead suggests that the applicants attempted to claim any device with performance metrics above what was disclosed in the prior art.  The asserted patents disclose three "prior art" devices.  ('034 patent, Fig. 17.)  These devices had power

3

performance metrics at, or very close to, the lower limit of the claimed ranges.[1] The asserted patents provide no formula for calculating the lower bounds of the power performance metrics in the asserted claims, but those lower bounds are close to the power performance metrics of the prior art.  (*Compare* '034 patent, cl. 1 (requiring volumetric FOM "greater than about" 3.2 $W/cm^3$), *with id.* at Fig. 17 ("Prior Art 3" with volumetric FOM of 3.20 $W/cm^3$).)

### 2.    The "Theoretical" Upper Limit Is Not a Limit

The asserted patents' specification discusses lines in Figures 12-15 ostensibly representing a "theoretical upper limit of the various parameters" for two of the exemplary devices (numbers 3 and 12) of Figure 17.  ('034 patent, 26:55-64, 27:9-14, Figs. 12-15, 17.)  The specification unambiguously states, however that those lines are not an upper limit on the scope of the patented devices: "It will be understood that the unbroken lines included in the Figures represent the limit for the two given formulations.  However, there are other formulations which provide an extended range of operability and allow higher figures of merit and power densities, as well as lower time constants, to be achieved."  (*Id.* at 27:9-14; *see also id.* at 26:63-64 ("For other formulations the

---

[1] The prior art devices have gravimetric FOMs up to 2.06 W/g and volumetric FOMs up to 3.20 $W/cm^3$, and gravimetric Pmax values range from 3.01-6.48 W/g and volumetric Pmax values range from 3.44-10.04 $W/cm^3$.  (*See* '034 patent, Fig. 17; Ex. 10 at CAP-XX-001281 at Figure 17 (referring to prior art devices A, B, and L).)  Those Pmax values are not recited in the patents, but can be found in CAP-XX's provisional application.

4

theoretical maximum will differ."); Ex. 11, Hruska Reply ¶ 122.)  Thus, the

unbroken lines in Figures 12-15 do not represent an absolute upper bound on

the asserted claims' power performance metrics.  (Fact 12.)

### C.    The Accused Products

CAP-XX accuses dozens of Maxwell supercapacitors of infringing the

asserted patents.  The accused supercapacitors range widely in size, shape, and

intended application.  (*See* Ex. 12.)  They also range widely in terms of power

performance.  (*See* Ex. 5; Ex. 13.)[2]  CAP-XX contends that the best performing

accused devices significantly exceed the power performance of the best

performing exemplary devices disclosed in the patents—with increases over the

disclosed examples up to 70%.  (*See* Fact 16.)  The substantial improvements

represented by the accused products stand in stark contrast with the marginal

improvement in performance claimed by the asserted patents, which claim, for

example, FOMs that are just higher than the "prior art."

## V.    ARGUMENT

### A.    The Asserted Patents Are Invalid Due to Lack of Enablement

The full scope of the asserted claims has no upper boundary, and the

claims cover power performance metrics up to an unknown limit.  The

specification does not enable these boundless claims.  Even under the

"theoretical" bounds of the claims, the specification provides no guidance on

---

[2] Maxwell disputes the admissibility and reliability of CAP-XX's data.

how to make devices that meet the claimed performance metrics—leaving the skilled artisan to rely undue experimentation and "luck."  Given the mismatch between the disclosures of the asserted patents and the unlimited scope of the asserted claims, Maxwell respectfully requests the Court grant summary judgment that the asserted claims are invalid for lack of enablement.

### 1.    The Law of Enablement

The enablement doctrine states that "[t]he specification shall . . . enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same[.]"  35 U.S.C. § 112 ¶1.  "This important doctrine prevents both inadequate disclosure of an invention and overbroad claiming that might otherwise attempt to cover more than was actually invented.  Thus, a patentee chooses broad claim language at the peril of losing any claim that cannot be enabled across its full scope of coverage."  *MagSil Corp. v. Hitachi Glob. Storage Techs., Inc.*, 687 F.3d 1377, 1381 (Fed. Cir. 2012).

To fulfill the enablement requirement, the specification must enable a POSITA to make and use the full scope of the claimed invention without undue experimentation.  *Trustees of Bos. Univ.*, 896 F.3d at 1362.  Whether the amount of experimentation required to practice the full scope of the claims is "undue" is determined as of the priority date of the patent.  *Id.*  Several factors may be considered in determining whether undue experimentation is required to practice a claim's full scope: "(1) the quantity of experimentation necessary, (2) the amount of direction or guidance presented, (3) the presence or absence

6

of working examples, (4) the nature of the invention, (5) the state of the prior

art, (6) the relative skill of those in the art, (7) the predictability or

unpredictability of the art, and (8) the breadth of the claims." *In re Wands*, 858

F.2d 731, 737 (Fed. Cir. 1988).

Enablement is a question of law based on underlying factual findings.

*MagSil Corp.*, 687 F.3d at 1380.

### 2.    The Full Scope of the Asserted Claims Requires Power Performance Metrics Up to an Unknown Limit

Using claim 51 of the '034 patent as an example, the claim recites a

device "wherein the gravimetric FOM (Figure of Merit) of the device is greater

than about 2.1 Watts/gram." (Fact 6.)  Each asserted claim similarly covers a

supercapacitor that exceeds a minimum power performance threshold—either a

volumetric or gravimetric FOM, or a volumetric or gravimetric Pmax. (*See*

Facts 2-6).

The open-ended language imposes no upper bounds on the claim.  There

is also no express or implied upper bound anywhere in the patents. (Fact 12.)

Similarly, neither CAP-XX's expert nor the inventors could identify an upper

bound in the claim. (*See* Fact 13)  Thus, short of infinity, which cannot literally

be achieved due to the laws of physics, there is no known upper bound on the

asserted claims. (*See* Ex. 11, Hruska Reply ¶ 118-119; Ex. 4, Zuckerbrod Tr.

247:25-248:12.)

7

CAP-XX argues that the claims have "theoretical" upper limits, citing Figures 12-15.  While those figures "each include two unbroken lines" that "represent the theoretical upper limit of the various parameters being illustrated for the examples 3 and 12" from Figure 17 ('034 patent, 26:55-59), the unbroken lines in those figures *do not* map to general upper limit values.  The unbroken lines represent only the limit for the devices of examples 3 and 12— the patent clarifies that "[f]or other formulations the theoretical maximum will differ."  (*Id.* at 26:63-64; 27:9-14.)  Thus, while the asserted patents explain that the example devices have theoretical maximum ranges for optimization, they also note that other devices that fall within the claims will have different, and potentially higher, power performance metrics.  (*Id.* at 27:9-14 ("[T]here are other formulations which provide an extended range of operability and allow higher figures of merit and power densities, as well as lower time constants, to be achieved.").)

Consistent with the above, CAP-XX's expert, Dr. David Zuckerbrod, confirmed there is no knowable upper bound on the claimed power performance.  (Ex. 4, Zuckerbrod Tr., 132:11-25 (no "magic formula" to determine an upper bound for each of the asserted claims' power performance metrics); *see also id.* at 249:6-22 (similar).)  He agreed that a POSITA would know that the laws of physics dictate that some upper limit exists, but would not know what that upper limit is.  (*Id.* at 253:5-12.)  A POSITA's understanding of the upper limit, Dr. Zuckerbrod explained, would also change and evolve

over time.  (*Id.* at 130:14-131:12; *see also id.* at 134:14-137:1 (information

beyond what is provided in the claims required to determine theoretical upper

limit).)

There can be no genuine dispute that the asserted claims contain no

known upper bound and, thus, that enabling the full scope of the claims requires

enabling the full scope of all theoretically possible higher power performance

metrics.

### 3.     The Asserted Patents Do Not Enable Unbounded Power Performance

There is no disclosure in the patents sufficient to build a device with

unlimited power performance, as the claims require.  (Ex. 9, Hruska Opening

¶ 429).  Nor does CAP-XX make the assertion that its patents support claims

with unbounded power performance.  (*See* Ex. 16, Zuckerbrod Rebuttal

¶¶ 185-191.)  On less compelling facts, the Federal Circuit confirmed that

boundless claims are invalid due to lack of enablement.  *See MagSil Corp.*, 687

F.3d at 1380-84 (affirming summary judgment of invalidity of boundless claims

due to lack of enablement).  In *MagSil,* the claims required "a change in the

resistance by at least 10%."  *Id.* at 1379.  The specification disclosed an 11.8%

change.  *Id.*  Subsequent improvements in technology allowed for substantially

larger changes, up to 600%.  *Id.* at 1382.  The inventors and experts identified

no upper bound for the claims.  *Id.* at 1381-82.  The Federal Circuit explained

that the open-ended nature of the claims was unforgiving, requiring that the full

9

scope be enabled.  *Id.* at 1384.  Because the specification only enabled a small subset of the claimed range, the claims were invalid and summary judgment was affirmed.  *Id.* at 1384.

The facts in this case require the same result.  As with *MagSil*, the claims and specification provide no upper boundary short of infinity.  (*See supra* § V.A.2.a.)  The named inventors also agree that no upper bound applies and CAP-XX's expert is unable to identify an upper bound.  (*See* Fact 13.)  And, as with *MagSil*, the specification does not enable the full unbounded scope of the claims at the time of the invention.  (Ex. 9, Hruska Opening ¶ 429.)  While improvements in technology since the patent filing have increased power performance metrics (*see id.* at ¶ 427), any such improvements are unrelated to the teachings of the asserted patents and, just like in *MagSil*, evidence that the full scope of the claims is not enabled.

Consistent with the court's analysis in *MagSil*, the disclosures of the asserted patents fall far short of the demanding requirement for enabling an unbounded claim range.  The Court should thus grant summary judgment that the asserted claims are invalid for lack of enablement.

### 4. The Asserted Patents Do Not Enable Reaching the "Theoretical" Maximum Power Performance Metrics

CAP-XX's position appears to be that the patents only need to teach a POSITA how to build devices that reach the unidentified "theoretical" upper limits.  But CAP-XX's approach does nothing to put a boundary on the

claims—CAP-XX's own expert is unable to identify what this "theoretical" maximum is that must be enabled by the specification.

There is also no dispute of material fact that the Asserted Patents do not enable a POSITA to reach the unidentified "theoretical" maximum. CAP-XX's expert opined that the Asserted Patents do not enable a device that reaches even close to the "theoretical" maximums.

For example, using CAP-XX's approach, the "theoretical" maximum value for volumetric figure of merit would exceed 80 watts/cm$^3$. (*See* Fact 18.) CAP-XX's expert, when asked whether a POSITA could make a device with a volumetric FOM of 25 watts/cm$^3$—less than one third of CAP-XX's "theoretical" maximum—testified that doing so would require "luck":

> Q. So a person of ordinary skill in the art, reading the patent, wouldn't be able to make a supercapacitor with, say, a volumetric figure of merit or -- of 25 watts/cm$^3$ or above?
>
> THE WITNESS: They might be able to. But there would -- hate to say it. *There would be a luck component there*. Yeah. It's – it's not – it's not such a simple relationship.

(*Id.* at 87:2-11 (emphasis added); *see also id.* at 89:23-90:25 ("luck" required to hit volumetric FOM of 20 watts/cm$^3$ or above); 92:24-93:15 ("luck" required to hit gravimetric FOM of 20 watts/gram or above); 93:17-19 (same for volumetric and gravimetric Pmax values).)

He further testified that it would also require better materials than were known at the time of the patents:

Q. And certainly the theoretical maximum, as you've described it, would be different today, right, sir?

A. I don't -- -- know -- I don't know what a theoretical maximum is, you know.  It's -- yeah, I don't think that that would be an easy number to come up with.

Q. And is that true for any of the performance metrics cited required by the asserted claims?

A. Well, you could come up with it, but it's going to have a lot of footnotes underneath it to specify what exactly -- you know, it's theoretical maximum for what? *You know, because we don't know what the -- what incredible electrolytes or incredible carbons are in the future, so we can't do the theoretical max.*  You can't just calculate a theoretical value, like a -- like in a battery, where every last bit of the stuff reacted at the -- at the highest potential it possibly could.  That's not -- it's not the way it works here.  It's not that kind of thing.

(*Id.* at 130:14-131:12 (emphasis added))

And it would also require significant time to experiment:

Q. So if a person of ordinary skill in the art was designing a supercapacitor and they wanted to make it have a performance metric like those used in the asserted claims and they wanted to reach 95 percent of the theoretical maximum, is it a matter of days, months, years, or decades that it would take them to design such a device?

THE WITNESS: Again, you have theoretical maximum.  That -- that doesn't exist.  You can -- you -- it's not a theoretical maximum.  There's no theory for it.  You -- you say: Okay.  I have this design, and I'm going to make calculations to say, okay, as the thickness of the electrode approaches zero, what does the power approach?  And so you can do that by maybe some experimentation and some calculation.  But you're starting from a tangible item, and there's no magic number at the end of the road to say: Okay.  You know, the magic number is -- is a hundred or a thousand, and -- and I'll have to work on it for three millennia to get to the -- to get to 95 percent of that number.

12

> There's -- there's -- that number isn't -- isn't there. The number only
> appears when you -- when you have a specific -- specific instruction
> in mind.

(*Id.* at 251:13-252:14.)

A POSITA cannot rely on "luck," availability of materials that did not exist at the time of the invention, and infinite time and experimentation to achieve the full scope of the invention. Consistent with CAP-XX's expert testimony on this issue, the Asserted Patents do not disclose devices that achieve the "theoretical" maximums or how to achieve those maximums.

### a. A POSITA Would Not Know How to Construct a Devices to Reach the "Theoretical" Maximum

The specification identifies a handful of devices achieving power performance metrics just above the claimed lower bound. (*See* '034 patent, 22:65-24:63, Figs. 17, 20.) But none of the examples provide details adequate to enable construction of any of the exemplary devices across the full scope of the claims. (*See id.* at 22:65-24:63; *see also* Ex. 11, Hruska Reply ¶¶ 130-133.) For example, there is no teaching in the specification as to the composition of the electrolyte, the design of the device, the types of carbon and ratios used, or the type of separator used in specific exemplary devices. (Ex. 11, Hruska Reply ¶¶ 123, 131-132; *see also generally* '034 patent.)

Nor do the patents provide any roadmap for how to build the exemplary devices. The generic considerations disclosed in the asserted patents do not identify which features allowed exemplary devices 3 and 12 to reach higher

13

power performance numbers than other exemplary devices.  (Ex. 11, Hruska

Reply ¶¶ 123.)  And, while the patents reference electrode thickness as relevant

to power performance, they provide no guidance on how to achieve the varying

electrode thicknesses required to reach the theoretical maximums for the two

devices, as outlined in Figure 16.  ('034 patent at Fig. 16 (listing theoretical

power performance metrics for electrodes with thickness between 1 and 500

micron).)  Simply knowing to vary the electrode thickness is not sufficient, as

CAP-XX acknowledges that a POSITA would not know how to make

electrodes within the thickness range set forth in Figure 16.  (Zuckerbrod Tr.

74:18-24 (POSITA could make electrode with thickness only between 50 and

250 micron).)

　　　Thus, the asserted patents disclose exemplary devices but not the

techniques or strategies for optimizing them to reach the "theoretical"

maximums.

### b.   The *Wands* Factors Confirm Lack of Enablement

　　　The *Wands* factors confirm that undue experimentation is required to

practice the full scope of the asserted claims

### i.   The Asserted Claims Have No Bounds

　　　The *Wands* factors require assessing the breadth of the claims.  *Wands*,

858 F.2d at 737.  A broad claim, such as one that has no bounds, is the type of

claim that would require extensive and an unacceptable amount of

experimentation.  *See MagSil Corp.*, 687 F.3d at 1381.

As discussed, the asserted claims have no bounds.  They cover supercapacitors with power performance metrics above the claimed lower bound up to an unspecified and unknown maximum.  (*See, e.g.*, Ex. 8, Vassallo Tr. 123:2-7;  Ex. 14, Keshishian Tr. 80:9-17; 82:9-84:7.)  The full magnitude of the claims scope is unknowable due to the unpredictability of future advances in the many aspects of supercapacitor design, including improvements in voltage and carbon design.  (*See* Ex. 4, Zuckerbrod Tr., 130:14-131:12, 132:11-25, 249:6-22.)  At minimum, CAP-XX asserts that the claims cover power performance metrics as much as 70% greater than the best performing exemplary devices.  (*See* Fact 16.)  But as stated above, the claim scope includes no such bounds.

### ii.     The Asserted Patents Do Not Provide Sufficient Guidance or Working Examples

The *Wands* factors consider the amount of direction and guidance provided by the patent, including the presence of working examples.  *Wands*, 858 F.2d at 737.  "Where . . . working examples are present but are very narrow, despite the wide breadth of the claims at issue this factor weighs against enablement."  *Idenix Pharms. LLC v. Gilead Scis. Inc.*, 941 F.3d 1149, 1161 (Fed. Cir. 2019) (quotation marks omitted).

As explained, the asserted patents describe devices with power performance metrics well short of even the "theoretical" maximums.  (*See* '034 patent, Figs. 17, 20.)  The patents provide generic guidance on basic principles

15

of supercapacitor construction, including a recitation of the well-known concept that decreasing resistance improve power performance.  (Ex. 4, Zuckerbrod Tr. 40:24-41:1, 222:4-15; Ex. 9, Hruska Opening ¶ 198.)  However, the specification provides no working examples of, and says nothing about how to achieve, substantially higher power performance metrics.  That the working examples are all relatively close to the claimed lower bounds (and far from the unidentified theoretical maximums) is strong evidence that undue experimentation would be required to achieve substantially more.

### iii.    A significant amount of experimentation would be necessary to practice the full scope of the asserted claims.

Another consideration in the *Wands* factor analysis is the amount of experimentation necessary to practice the full scope of the claims.  *Wands*, 858 F.2d at 737.

Practicing the full scope requires, at a minimum, increasing supercapacitor voltage and developing new supercapacitor components (e.g. carbons, separators, terminals, packaging) to minimize resistance.  (*See* Ex. 9 Hruska Opening ¶ 427)  Developing higher voltage supercapacitors can take decades.  (*See* Ex. 16, Zuckerbrod Rebuttal ¶ 186; Ex. 17.)  Further, there is no dispute that achieving high power performance devices requires "luck" and as much as three millennia worth of experimentation—which is the height of undue experimentation.  (Ex. 4, Zuckerbrod Tr., 87:2-17; 90:7-16, 92:23-93:19, 251:13-252:14.)

16

iv.     **Nature of Invention; State of the Prior Art; Predictability of the Art; and Level of Skill**

The last several *Wands* factors are reflected in the discussion above and support that undue experimentation would be required to practice the full scope of the claims.  *See Wands*, 858 F.2d at 737.  As discussed, supercapacitors and their component parts were well known and conventional at the time of the invention.  (*See* Fact 17.)  The claims effectively carve out prior art supercapacitors' power performance and cover all future improvements without regard to how those improvements are achieved.

In sum, a consideration of the complete record, including through the lens of the *Wands* factors, establishes that summary judgment of invalidity for lack of enablement is warranted.  There is no genuine dispute that undue experimentation has been, and would have been, required to practice the full scope of the asserted claims.

B.     **The Asserted Patents Are Invalid for Failing to Meet the Written Description Requirement**

Like the enablement doctrine, the requirement that a claim be adequately supported by a patent's written description is rooted in 35 U.S.C. § 112. 35 U.S.C. § 112 ¶1.  Whether the written description requirement is met turns on whether the inventors convey "with reasonable clarity to those skilled in the art that, as of the filing date sought," they possessed the invention through the "disclosure in the specification of the patent."  *Nuvo Pharms. (Ireland) Designated Activity Co. v. Dr. Reddy's Lab'ys Inc.*, 923 F.3d 1368, 1376 (Fed.

17

Cir. 2019) (quotation marks omitted).  The patentee must demonstrate

possession of the full scope of the claimed invention to meet the requirement.

*See LizardTech, Inc. v. Earth Res. Mapping, Inc.*, 424 F.3d 1336, 1345 (Fed.

Cir. 2005).

The asserted patents do not show that the inventors possessed the full

scope of the unbounded asserted claims at the time of filing.  As discussed in

the enablement analysis, the patents disclose only a small number of devices

with power performance metrics well below any actual or theoretical

maximums.  From this disclosure, and for all the same reasons set forth in the

enablement analysis, a POSITA at the time of the invention would not have

reasonably believed that the inventors were in possession of all devices capable

of achieving substantially higher power performance metrics.

But there is an additional reason why these patents fail under the written

description requirement.  The written description inquiry focuses specifically on

what a POSITA would have understood the inventors to possess.  In the case of

these asserted patents, the inventors provided devices with very specific

measurements, and then claimed power performance metrics that were

demonstrably higher than those measurements.  Even if those power

performance limits have a bound (as CAP-XX argues), that bound is

aspirational (i.e., "theoretical") and far greater than any of the devices described

in the specifications.  ('034 patent, 26:55-64; Figs. 12-15, 17.)  Thus, if every

inference is resolved in CAP-XX's favor, the inventors may have been in

18

possession of devices that were above the claimed limits, but not of devices that met, or were anywhere near, the "theoretical" upper limits.

Because the specification does not show that the inventors had possession of such vast claim scope, in particular given the description of purely "theoretical" devices in the asserted patents, summary judgment of invalidity for failure to meet the written description requirement should be entered.

## VI.    CONCLUSION

For the foregoing reasons, Maxwell respectfully requests the Court enter summary judgment that the asserted claims are invalid for failure to meet the enablement and written description requirements of 35 U.S.C. § 112.

Dated:  July 15, 2022                          FISH & RICHARDSON P.C.

                                        By: */s/ Susan E. Morrison*
                                            Susan E. Morrison (#4690)
                                            Grayson P. Sundermeir (#6517)
                                            222 Delaware Avenue, 17th Floor
                                            Wilmington, DE 19801
                                            (302) 652-5070
                                            morrison@fr.com
                                            sundermeir@fr.com

                                            Daniel R. Gopenko
                                            FISH & RICHARDSON P.C.
                                            1000 Maine Avenue, SW
                                            Suite 1000
                                            Washington, DC 20024
                                            (202) 626-7745
                                            gopenko@fr.com

                                            Aamir A. Kazi
                                            FISH & RICHARDSON P.C.
                                            1180 Peachtree Street NE
                                            21st Floor
                                            Atlanta, GA 30309
                                            (404) 724-2811
                                            kazi@fr.com

                                            Matthew Colvin
                                            FISH & RICHARDSON P.C.
                                            1717 Main Street
                                            Suite 5000
                                            Dallas, Texas 75201
                                            (214) 292-4013
                                            colvin@fr.com

                                        *Attorneys for Defendant*
                                        *MAXWELL TECHNOLOGIES, INC.*

20

## <u>WORD COUNT CERTIFICATION</u>

The undersigned counsel hereby certifies that the foregoing document contains 4,474 words, which were counted by using the word count feature in Microsoft Word, in 14-point Times New Roman font. The word count includes only the body of the foregoing document. The word count does not include the cover page, tables of contents and authorities, or the counsel blocks.

<u>/s/ Susan E. Morrison</u>
Susan E. Morrison (#4690)
