# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

CAP-XX, LTD.,

      Plaintiff,

    v.

MAXWELL TECHNOLOGIES INC.,

      Defendant.

C.A. No. 19-1733 (CFC)



**REDACTED PUBLIC VERSION**

---

## DEFENDANT MAXWELL TECHNOLOGIES INC.'S OPENING BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT <u>REGARDING INFRINGEMENT UNDER 35 U.S.C. § 271(f)</u>

**FISH & RICHARDSON P.C.**
Susan E. Morrison (#4690)
Grayson P. Sundermeir (#6517)
222 Delaware Avenue, 17th Floor
Wilmington, DE 19801
morrison@fr.com;
sundermeir@fr.com

Daniel R. Gopenko
1000 Maine Avenue, SW, Suite 1000
Washington, DC 20024
gopenko@fr.com

Aamir A. Kazi
1180 Peachtree Street NE, 21st Floor
Atlanta, GA 30309
kazi@fr.com

Matthew Colvin
1717 Main Street, Suite 5000
Dallas, Texas 75201
colvin@fr.com

*Attorneys for Defendant*
*MAXWELL TECHNOLOGIES, INC.*

# TABLE OF CONTENTS

I.    INTRODUCTION ...................................................................................... 1

II.    SUMMARY OF ARGUMENT ................................................................. 1

III.   STATEMENT OF FACTS ........................................................................ 3

    A.  Maxwell Manufactured in the United States an Electrode Used in Some Accused Products Manufactured Abroad ........................................ 3

    B.  The Electrodes Manufactured by Maxwell in the United States were Used in Non-Infringing, Commercial LCAP Products Made by SRI in China ............................................................................................. 5

IV.   LEGAL STANDARDS ............................................................................ 9

V.    ARGUMENT ......................................................................................... 11

    A.  The Electrodes Supplied from the United States are not "All or a Substantial Portion of the Components" in Maxwell's EDLCs Made and Sold Abroad ................................................................................ 12

    B.  Maxwell's Electrodes Supplied from the United States are Capable of Substantial, Non-Infringing Use .................................................... 14

       1. Maxwell's Electrodes Were Used in Non-Infringing Devices ........... 14

       2. The Non-Infringing Use of Maxwell's Electrodes Was "Substantial" .................................................................................... 15

       3. Maxwell Does Not Intend for the Electrodes to be Combined in an Infringing Manner ........................................................................... 19

VI.   CONCLUSION ...................................................................................... 21

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Blackbird Tech LLC v. ELB Elecs., Inc.*,
  No. CV 15-056-RGA, 2020 WL 5409052 (D. Del. Sept. 9, 2020) ....................17

*Golden Blount, Inc. v. Robert H. Peterson Co.*,
  438 F.3d 1354 (Fed. Cir. 2006) .........................................................................10

*Grunenthal GMBH v. Alkem Lab'ys Ltd.*,
  919 F.3d 1333 (Fed. Cir. 2019) .........................................................................17

*Howmedica Osteonics Corp. v. Zimmer, Inc.*,
  822 F.3d 1312 (Fed. Cir. 2016) .........................................................................19

*Life Techs. Corp. v. Promega Corp.*,
  137 S.Ct. 734 (2017)...........................................................................9, 12, 13

*Ormco Corp. v. Align Tech. Inc.*,
  609 F.Supp.2d 1057 (C.D. Cal. 2009) ..........................................................10, 15

*Pharmacyclics LLC v. Cipla Ltd.*,
  2020 WL 6581643 (D. Del. Nov. 10, 2020)..................................................19, 20

*Toshiba Corp. v. Imation Corp.*,
  681 F.3d 1358 (Fed. Cir. 2012) .........................................................................17

*Veeco Inst. Inc. v. SGL Carbon, LLC*,
  2017 WL 5054711 (E.D.N.Y. Nov. 2, 2017) ........................................10, 11, 19

*Vita-Mix Corp. v. Basic Holding, Inc.*,
  581 F.3d 1317 (Fed. Cir. 2009) ....................................................................10, 15

*WesternGeco L.L.C. v. ION Geophysical Corp.*,
  791 F.3d 1340 (Fed. Cir. 2015........................................................................9

*WesternGeco L.L.C. v. ION Geophysical Corp.*,
  No. 4:09-CV-1827, 2012 WL 2568167 (S.D. Tex. June 29, 2012) ...................11

*Whitewater W. Indus., Ltd. v. Pac. Surf Designs, Inc.*,
No. 3:17-CV-01118, 2019 WL 4452986 (S.D. Cal. Sept. 16, 2019) ...........11, 20

**Statutes**

35 U.S.C. § 271(f) ...............................................................................................*passim*

## I.    INTRODUCTION

CAP-XX seeks to improperly extend the reach of its U.S. patents to capture

sales of accused products made and sold overseas.  CAP-XX injected into this case a

last minute infringement theory under 35 U.S.C. § 271(f) that is premised upon

Maxwell's provision of a single component from the United States for incorporation

in accused products manufactured abroad.  But CAP-XX did not develop the

necessary facts to prove that any foreign sales would infringe under § 271(f).

Moreover, the factual record demonstrates that § 271(f) is not applicable and the

opinions of Maxwell's experts on this issue stand unrebutted.  The Court should

therefore grant summary judgment that Maxwell does not infringe under § 271(f).[1]

## II.    SUMMARY OF ARGUMENT

1)    Section 271(f) provides for infringement liability of foreign sales in

two limited circumstances.  The first circumstance, set out in § 271(f)(1), is

supplying from the United States all or a substantial portion of the components of

an infringing product.  The second circumstance, set out in § 271(f)(2), is

providing from the United States components not capable of substantial non-

infringing use where the accused infringer intends the components to be combined

---

[1] Maxwell previously submitted two summary judgment motions, each of which were numbered in accordance with this Court's instructions for summary judgment briefing.  (*See* D.I. 149; D.I. 153.)  For this motion, however, the Court "excuse[d] the numbering rule" and said it would address this issue regardless of its determinations on the first two of Maxwell's dispositive motions.  (*See* Ex. 19 (8/25/2022 Hearing Tr.) at 42:20-43:18.)

outside the U.S. in a manner that would infringe if such combination occurred within the U.S.  CAP-XX bears the burden of proving infringement.  But on the evidence of record here, there is no dispute of material fact that Maxwell's conduct does not give rise to liability under either provision.

2)     First, the electrodes provided by Maxwell were only one component of the accused, multi-component EDLC products.  Maxwell thus did not provide "all or a substantial portion of the components" of an infringing product as required by § 271(f)(1).

3)     Second, the electrodes Maxwell sold overseas were capable of substantial non-infringing use.  Maxwell provided ██████ of meters of electrode material used in Maxwell's allegedly infringing EDLCs to a foreign manufacturer, SRI, for incorporation into SRI's non-infringing, lithium-capacitor (LCAP) products.  There can be no dispute these commercial sales were "substantial" under § 271(f)(2), and there is no dispute that SRI's LCAPs are non-infringing.

4)     Third, CAP-XX has not developed any facts that would show Maxwell acted with the requisite intent under § 271(f)(2).  No documentary evidence suggests that Maxwell acted with intent.  Even more, CAP-XX's experts acknowledged the intent requirement of § 271(f)(2) but are entirely silent on its application to any alleged facts.

5)      With no dispute of material facts under either subsection, the Court should grant summary judgment that Maxwell does not infringe pursuant to § 271(f).

III.   **STATEMENT OF FACTS**

**A.     Maxwell Manufactured in the United States an Electrode Used in Some Accused Products Manufactured Abroad**

The accused products in this case concern electric double layer capacitors (EDLCs) that Maxwell sold until the asserted patents expired in 2022, often referred to as "supercapacitors" or "ultracapacitors."  EDLCs are multicomponent devices capable of quickly storing and discharging power.  Every EDLC is comprised of multiple components including electrodes, separator, electrolyte, layers of packaging or housing, terminals, and in the case of larger module products, balancing circuits that facilitate operation across all the component cells. (*See, e.g.*, Ex. 2 (3/25/22 Hruska Rep.), ¶¶ 96-100; Ex. 3 (4/25/2022 Hruska Rep), ¶ 72; Ex. 4 (Zuckerbrod Tr.) at 51:20-59:23.)  Maxwell's EDLC product portfolio consisted of multiple product lines, including smaller "cell" products (Standard, XP, and DuraBlue®) and larger "module" products.  (*See* Ex. 3 (4/25/2022 Hruska Rep.), ¶¶ 59-75.)  CAP-XX accuses nearly all Maxwell EDLC products of infringing the asserted '034 and '600 patents.  (*Id.*, ¶¶ 52-53.)

Maxwell primarily manufactured its different EDLC product lines outside the United States.  Manufacture and assembly of Maxwell's "cell" product lines

3

(Standard, XP, and DuraBlue®) occurred in China and South Korea.  (*See* Ex. 5 (Zupanovic Tr.)  at 128:9-132:11; Ex. 6 (Bendale Tr.) at 175:16-176:9, 177:11-14, 187:10-19; *see also* Ex. 7 (Maxwell 2018 10-K) at MAXWELL-CAPXX-016119; Ex. 8 (Maxwell 2017 10-K) at MAXWELL-CAPXX-015976.)  Maxwell's "modules" were primarily manufactured and assembled in China.[2]  (*See* Ex. 7 (Maxwell 2018 10-K) at MAXWELL-CAPXX-016119; Ex. 8 (Maxwell 2017 10-K) at MAXWELL-CAPXX-015976; Ex. 6 (Bendale Tr.) at 181:22-182:12; *see also* Ex. 5 (Zupanovic Tr.) at 22:25-23:3, 132:25-133:4.)

Maxwell manufactured only one component of the ELDCs in the United States—the electrode—and even that was only for a subset of the Maxwell products manufactured abroad.  Maxwell's electrodes for the Standard and DuraBlue® cell products were made in Arizona, while the electrodes for the XP cell products were manufactured in Korea.  (*See* Ex. 6 (Bendale Tr.) at 175:16-176:9, 177:11-14, 187:15-19; Ex. 9 (3/1/22 Bouchard Tr.) at 198:1-21; Ex. 7 (Maxwell 2018 10-K, MAXWELL-CAPXX-016107) at MAXWELL-CAPXX-016119; Ex. 8 (Maxwell 2017 10-K, MAXWELL-CAPXX-015966) at

---

[2] Maxwell manufactured a limited number of "module" products in the United States.  (*See, e.g.*, Ex. 6 (Bendale Tr.) at 179:7-180:7 (describing Maxwell's "ESM" and "GEN" modules as assembled in the United States using cells made in China.)  Modules are comprised of a collection of "cells" linked together.  (*See* Ex. 1 (3/25/2022 Zuckerbrod Rep.), ¶ 56 ("Multi-cell devices are called modules.").)

MAXWELL-CAPXX-015976.)  Maxwell's modules were manufactured abroad using the same electrode.  Maxwell shipped the completed electrodes from Arizona to EDLC manufacturers abroad and the foreign manufacturers combined these electrodes with the other components of the EDLC to form a completed product.  (*See* Ex. 9 (3/1/22 Bouchard Tr.) at 198:1-21; *see also* Ex. 1 (3/25/2022 Zuckerbrod Rep.), ¶ 136.)  Once manufactured and assembled, the EDLCs were shipped directly to customers, including those outside the United States.  (*See* Ex. 5 (Zupanovic Tr.) at 22:8-18.)

**B.    The Electrodes Manufactured by Maxwell in the United States were Used in Non-Infringing, Commercial LCAP Products Made by SRI in China**

Maxwell's Arizona-made electrodes were also used in products other than the accused EDLCs.  Specifically, Maxwell sold these electrodes to SRI,[3] a Chinese railroad equipment company, for use in the construction of SRI's lithium ion capacitors ("LCAP" or "LICAP").[4]  (Ex. 3 (4/25/2022 Hruksa Rep.), ¶ 113; *see also* Ex. 12 (2/9/2023 Bouchard Tr.) at 18:25-19:12.)

---

[3] "SRI" is the common abbreviation used for Qingdao Sifang Rolling Stock Research Institute Co., Ltd.  SRI is a manufacturer of railroad equipment.  (*See* Ex. 10 (MAXWELL-CAPXX-040216) at MAXWELL-CAPXX-040216 (reciting that SRI "has extensive expertise [and] knowledge … regarding technologies of critical systems in railway transportation, boosting progress in industrial technologies, and developing together with global railway transportation.").)
[4] Lithium ion capacitors (LCAPs) are a hybrid between supercapacitors and Lithium Ion batteries.  (*See* Ex. 3 (4/25/2022 Hruksa Rep.), ¶ 114.)

Maxwell's and SRI's commercial relationship began nearly a decade ago.  In June 2015, Maxwell and SRI executed a "Master Agreement."  (Ex. 10 (MAXWELL-CAP-XX-040216).)  This agreement contemplated SRI's development of LCAP products, ███████████████████████████████ ██████████████████████████ (*Id*. at MAXWELL-CAPXX-040217-18 ("Recitals" section); *id*. at MAXWELL-CAPXX-040222-23 ████████████████ ██████████████████████████████████████████.)  Once SRI's production line was operational, the parties intended that SRI would independently manufacture LCAPs and Maxwell would be the exclusive supplier of electrodes for SRI's LCAP products.  (*Id*. at MAXWELL-CAPXX-040223 (designating "[Maxwell] as the sole provider of Electrodes for the [lithium ion capacitor] Cell mass-production line of [SRI]."); *see* Ex. 11 (MAXWELL-CAPXX-044293) at MAXWELL-CAPXX-044295-96 ████████████████ ████████████████████████████████████████████ ██████████████████); Ex. 12 (2/9/2023 Bouchard Tr.) at 21:15-22:6).)  While it was establishing its own LCAP manufacturing capabilities, SRI ordered entire LCAP products from Maxwell, not just electrodes.  (*See, e.g.*, Ex. 13 (MAXWELL-CAPXX-044310 (March 1, 2016 purchase agreement for "LCAP Cells."); *see also* Ex. 12 (2/9/2023 Bouchard Tr.) at 22:15-24:9 (describing

that Maxwell targeted production output of up to ██████████ from its San

Diego facility).)[5]

In late 2019, SRI's commercial LCAP manufacturing capabilities became

operational.  (*See, e.g.*, Ex. 12 (2/9/2023 Bouchard Tr.) at 27:21-25.)  SRI's

production line in China was capable of running around the clock at a production

rate of ██████████. (*See* Ex. 12 (2/9/2023 Bouchard Tr.) at 31:2-16.)  In

October 2019, Maxwell and SRI executed a "Completion Agreement," which

acknowledged Maxwell's completion of its obligations to ████████████

████████████████████ (Ex. 14 (MAXWELL-CAPXX-41502);

*see* Ex. 12 (2/9/2023 Bouchard Tr.) at 94:11-95:6.)  At the same time, Maxwell

and SRI also executed a license agreement whereby Maxwell granted SRI a

---

[5] Maxwell's commercial arrangement with SRI was also reflected
contemporaneously in public press releases. *See, e.g.*, "Maxwell Technologies and
CRRC-SRI Sign Long-Term Strategic Partnership Agreement," CIOReview, Aug.
7, 2015 (https://www.cioreview.com/news/maxwell-technologies-and-crrcsri-sign-
longterm-strategic-partnership-agreement-nid-7817-cid-53.html);  "First
Commercial Use of Lithium-Ion Capacitor Technology in China," Mass Transit
Magazine, Nov. 1, 2016 (https://www.masstransitmag.com/technology/press-
release/12275311/maxwell-technologies-inc-maxwell-technologies-delivers-first-
commercial-application-of-lithiumion-capacitor-technology-in-china); "China first
to embrace commercial use of lithium-ion capacitor," BestMag, Nov. 11, 2016
(https://www.bestmag.co.uk/china-first-embrace-commercial-use-lithium-ion-
capacitor/); "Maxwell Technologies Expands Partnership with China Railway
Rolling Stock Corporation (CRRC) to Localize Ultracapacitor Module Production
for the China Bus Market," PRNewswire, Jan. 31, 2017
(https://www.prnewswire.com/news-releases/maxwell-technologies-expands-
partnership-with-china-railway-rolling-stock-corporation-crrc-to-localize-
ultracapacitor-module-production-for-the-china-bus-market-300399907.html).

royalty-free license to use Maxwell's Intellectual Property in the manufacture of its LCAP products, "so long as SRI procures LCAP Electrodes exclusively from Maxwell." (Ex. 15 (MAXWELL-CAPXX-041495) at MAXWELL-CAPXX-041496.)

True to the parties' agreements, the operational SRI production line manufactured LCAP products using electrodes supplied by Maxwell. (*See* Ex. 12 (2/9/2023 Bouchard Tr.) at 32:6-34:19.) On July 26, 2019, SRI submitted two purchase orders to Maxwell totaling over ███████ meters of electrode material for use in its LCAPs. (Ex. 16 (MAXWELL-CAPXX-044308); Ex. 17 (MAXWELL-CAPXX-044306); *see also* Ex. 12 (2/9/2023 Bouchard Tr.) at 44:21-47:22.)

CAP-XX has neither offered evidence nor alleged that lithium ion capacitors, such as those made by SRI, would infringe the asserted patents, and its expert acknowledges that LCAPs are poorly suited for uses typical of an EDLC. (*See* Ex. 18 (5/18/2022 Zuckerbrod Rep.), ¶¶ 58-60 (calculating a $gP_{max}$ below the range claimed in the asserted patents and explaining "[t]his shows the LICAP device has a much lower power density than a similar capacitance Maxwell EDLC and would not be suitable for EDLC applications"); *see also* Ex. 5 (Zupanovic Tr.) at 81:25-82:7.) There is thus no dispute that the electrode usage in LCAPs constitutes a non-infringing use. (*See id.*; *see also* Ex. 3 (Hruska Rep.), ¶¶ 114-117

(opining that an LCAP using Maxwell electrodes would not meet the claimed performance limitations).)

IV.   **LEGAL STANDARDS**

"Broadly speaking, [Section § 271](f)(1) prohibits supplying a substantial portion of the components of a patented system in a manner that actively induces their combination abroad." *WesternGeco L.L.C. v. ION Geophysical Corp.*, 791 F.3d 1340, 1343 (Fed. Cir. 2015), *cert. granted, judgment vacated sub nom. WesternGeco LLC. v. ION Geophysical Corp.*, 579 U.S. 915, 136 S. Ct. 2486, 195 L. Ed. 2d 820 (2016), *reinstated in relevant part*, *WesternGeco L.L.C. v. ION Geophysical Corp.*, 837 F.3d 1358, 1360 (Fed. Cir. 2016), *rev'd sub nom. WesternGeco LLC v. ION Geophysical Corp.*, 201 L. Ed. 2d 584, 138 S. Ct. 2129 (2018), *opinion reinstated in relevant part*, 913 F.3d 1067 (Fed. Cir. 2019).  This "substantial portion" of components requirement is a quantitative—not qualitative—measurement. *See Life Techs. Corp. v. Promega Corp.*, 137 S.Ct. 734, 741 (2017) ("[W]e conclude that a quantitative interpretation hews most closely to the statute and provides an administrable construction.").

Also broadly speaking, "[§ 271] (f)(2) prohibits supplying components that are especially adapted to work in a patented invention and intending that the components be combined abroad in a manner that would infringe if combined domestically." *WesternGeco*, 791 F.3d at 1343.  In the context of Section

9

271(f)(2), "non-infringing uses are substantial when they are not unusual, far-fetched, illusory, impractical, occasional, aberrant, or experimental." *Vita-Mix Corp. v. Basic Holding, Inc*., 581 F.3d 1317, 1327 (Fed. Cir. 2009).  CAP-XX bears the "burden of proving there were no substantial non-infringing uses" for the components in question.  *See Golden Blount, Inc. v. Robert H. Peterson Co.*, 438 F.3d 1354, 1363 (Fed. Cir. 2006); *Veeco Inst. Inc. v. SGL Carbon, LLC*, 2017 WL 5054711, at *21 (E.D.N.Y. Nov. 2, 2017) (citing *Toshiba Corp. v. Imation Corp.*, 681 F.3d 1358, 1363 (Fed. Cir. 2012)) ("To prevail on a claim under 35 U.S.C. § 271(f)(2), the patentee has the burden to prove the lack of substantial non-infringing uses for the exported component.").  If CAP-XX makes a *prima facie* showing that the components had no non-infringing use, then the burden of production shifts to Maxwell "to introduce some evidence that end-users actually [used the components] in a non-infringing way." *See id*. at 1363-64.  "In order to take advantage of the 'substantial noninfringing use' exception, an alleged infringer must show both that 'the device at issue, in theory, could be used in a way so as not to infringe the asserted [] claim' and 'that the device was actually used in the non-infringing way.'" *Ormco Corp. v. Align Tech. Inc.*, 609 F.Supp.2d 1057, 1075 (C.D. Cal. 2009) (quoting *Golden Blount*, 438 F.3d at 1363).

With respect to the "intent" requirement of Section 271(f)(2), district courts frequently assess whether: "the defendant (i) intended the combination of

components to occur outside the United States, (ii) knew that the combination it intended was covered by a United States patent, and (iii) knew that the combination it intended would be infringing if it occurred in the United States." *See, e.g.*, *Veeco Instruments Inc. v. SGL Carbon, LLC*, No. 17-CV-2217 (PKC), 2017 WL 5054711, at *22 (E.D.N.Y. Nov. 2, 2017); *see also WesternGeco L.L.C. v. ION Geophysical Corp.*, No. 4:09-CV-1827, 2012 WL 2568167, at *4 (S.D. Tex. June 29, 2012) (holding intent requirement is identical to 271(c)); *Whitewater W. Indus., Ltd. v. Pac. Surf Designs, Inc.*, No. 317CV01118BENBLM, 2019 WL 4452986, at *12 (S.D. Cal. Sept. 16, 2019) ("Section § 271(f)(2) requires a plaintiff to prove that the defendant (1) intended the combination of components; (2) knew that the combination he intended was patented and (3) knew that the combination he intended would be infringing if it occurred in the United States.").

## V.   **ARGUMENT**

Although this is an issue on which CAP-XX bears the burden, CAP-XX's experts do not opine on the ultimate application of § 271(f).  Nor do they rebut the ultimate conclusions from Maxwell's expert that § 271(f) does not apply or identify any facts contrary to those relied upon by Maxwell's experts.  Rather, CAP-XX's technical expert (Dr. Zuckerbrod) provides an analysis that is legally irrelevant to § 271(f)(1) and makes incorrect assumptions that he later retracts in

his analysis of § 271(f)(2).  CAP-XX has no ability to carry its burden, and the Court should grant Maxwell's motion on that basis alone.

The facts also do not support the application of § 271(f), as neither subsection is satisfied by Maxwell's provision of electrodes from the United States to foreign manufacturers of accused products.  The electrodes are not "all or a substantial portion of the components" of the accused EDLC's manufactured abroad, and thus there is no liability under § 271(f)(1).  Nor is Maxwell liable pursuant to § 271(f)(2) because (1) the electrodes in question are capable of substantial, non-infringing use and, (2) CAP-XX has no evidence to suggest that Maxwell possessed the requisite intent to infringe under this subsection.

The court should therefore grant Maxwell's motion for summary judgment of no infringement under § 271(f).

A.  **The Electrodes Supplied from the United States are not "All or a Substantial Portion of the Components" in Maxwell's EDLCs Made and Sold Abroad**

Provision of a single component cannot be a "substantial portion" and there is no dispute that Maxwell supplied only one component (the electrodes) from the United States for use in a subset of Maxwell's multicomponent EDLCs.  (*See, e.g.*, Ex. 1 (Zuckerbrod Op. Rpt.), ¶ 136).)  "[A]s a matter of law, a single component can [n]ever constitute a 'substantial portion' so as to trigger liability under § 271(f)(1)."  *Life Techs.*, 137 S. Ct. at 741.  "[W]here a product is made abroad

and all components but a single commodity article are supplied from abroad, this activity is outside the scope of the statute." *Id*. at 743.  Thus, under *Life Technologies*' quantitative framework, Maxwell's provision of electrodes from the United States for use in multicomponent EDLCs assembled and sold abroad is insufficient for liability under Section 271(f)(1).  *See id*. at 739 ("The question before us is whether the supply of a single component of a multicomponent invention is an infringing act under 35 U.S.C. § 271(f)(1).  We hold that it is not.").

Electrodes are just one component of the EDLC.  Both parties and their experts agree that, in addition to electrodes, EDLCs included a separator, electrolyte, layers of packaging or housing, terminals, and for module products, balancing circuits that facilitated operation across all the component cells.  (*See, e.g.*, Ex. 2 (3/25/22 Hruska Rep.), ¶¶ 96-100; Ex. 3 (4/25/2022 Hruska Rep), ¶ 72; Ex. 4 (Zuckerbrod Tr.) at 51:20-59:23.)  The asserted patents reflect the same understanding.  (*See, e.g.*, D.I. 70, Ex. A ('034 patent) at Claim 1 (claiming structural EDLC elements including electrodes, porous separator, packaging, electrolyte, and at least two terminals).)  Maxwell's expert therefore opined that, under a quantitative framework, the electrodes "do not comprise even a substantial

portion of the claimed multicomponent device."[6]  (Ex. 3 (4/25/2022 Hruska Rep).

¶ 118.)

Rather than perform the requisite *quantitative* analysis under § 271(f)(1),

CAP-XX's experts erroneously offered a *qualitative* assessment.  (*See* Ex. 1

(3/25/2022 Zuckerbrod Rep.), ¶ 136 (opining on qualitative importance of

electrodes); Ex. 20 (4/25/2022 Zuckerbrod Rep.) ¶ 54 (same); *see also* Ex. 21

(3/25/2022 Pinsonneault Rep.), ¶ 317 (relying on Dr. Zuckerbrod's qualitative

assessment).)  These qualitative assessments disregard the Supreme Court's

holding in *Life Technologies* and are thus legally irrelevant.

With no dispute that Maxwell supplied only one component from the United

States, Maxwell is not liable for infringement pursuant to § 271(f)(1).

**B.   Maxwell's Electrodes Supplied from the United States are Capable of Substantial, Non-Infringing Use**

**1.   Maxwell's Electrodes Were Used in Non-Infringing Devices**

There is no dispute that SRI's LCAPs, which incorporated Maxwell's

electrodes, are non-infringing.  CAP-XX has not accused any LCAP products of

---

[6] Even if Maxwell's electrodes counted as two components of an EDLC instead of
one component, they would still not constitute a "substantial portion" of the
components of the accused products.  For example, if the electrodes are considered
as two components, the asserted patents claim at least seven structural components.
(*See* D.I. 70, Ex. A ('034 patent), cl. 1.)  CAP-XX has nothing to suggest that a
small minority of components (two of seven) would comprise a "substantial
portion" of components under § 271(f).

infringement.  It has offered no evidence that LCAPs, such as those made by SRI, would infringe the asserted patents.  Even more, its expert unambiguously opined that LCAPs are poorly suited for uses typical of an EDLC.  (*See* Ex. 20 (4/25/2022 Zuckerbrod Rep.), ¶¶ 58-60 ("This shows the LICAP device has a much lower power density than a similar capacitance Maxwell EDLC and would not be suitable for EDLC applications."); *see also* Ex. 5 (Zupanovic Tr.) at 81:25-82:7.) Maxwell's expert Dr. Hruska also agrees that LCAPs would not infringe.  (*See* Ex. 3 (Hruska Rep.), ¶¶ 114-117 (opining that an LCAP using Maxwell electrodes would not meet the claimed performance limitations).)  There is thus no dispute that use of Maxwell's electrodes in SRI's LCAPs would constitute non-infringing use.  Such conduct therefore precludes liability under Section 271(f)(2).  *See Ormco,* 609 F.Supp.2d at 1075.

### 2. The Non-Infringing Use of Maxwell's Electrodes Was "Substantial"

Second, Maxwell's electrode sales to SRI were substantial.  Under Section 271(f)(2), "non-infringing uses are substantial when they are not unusual, far-fetched, illusory, impractical, occasional, aberrant, or experimental."  *Vita-Mix Corp. v. Basic Holding, Inc*., 581 F.3d 1317, 1327 (Fed. Cir. 2009).  Under this

framework, there can be no dispute that Maxwell's sales of electrodes to SRI were substantial.

SRI worked ████████████████████ for years to develop mass-production capabilities for its non-infringing LCAP products.  (*See* Section III.b., *supra*.)  The parties' contemplated at the outset of their commercial arrangement that, once SRI's LCAP manufacturing was operational, it would commercially mass-produce LCAP products for which Maxwell would be the exclusive provider of electrodes.  (*See* Ex. 10 (MAXWELL-CAPXX-00216) at MAXWELL-CAPXX-040223.)  Until SRI had infrastructure to produce LCAPs on its own, Maxwell created LCAP production lines in the United States and supplied the LCAPs to SRI.  (*See, e.g.*, Ex. 13 (MAXWELL-CAPXX-044310 (March 1, 2016 purchase agreement for "LCAP Cells."); *see also* Ex.12 (2/9/2023 Bouchard Tr.) at 22:15-24-9 (describing a target output of ██████████ ).)

When SRI's LCAP production line became operational by late 2019, Maxwell switched to supplying only the electrodes instead of the entire LCAP product.  (*See* Ex. 12 (2/9/2023 Bouchard Tr.) at 32:6-34:19; *see also* Ex. 15 (MAXWELL-CAPXX-041495) at MAXWELL-CAPXX-041496 (granting license for SRI to manufacture LCAP products covered by Maxwell's intellectual property).)  In anticipation of its mass-production capabilities, SRI in 2019 purchased over ██████ meters of electrode material for use in its LCAP

products.  (Ex. 16 (MAXWELL-CAPXX-044308); Ex. 17 (MAXWELL-CAPXX-044306); *see also* Ex. 12 (2/9/2023 Bouchard Tr.) at 44:21-47:22.)  Maxwell's electrode sales to SRI are clearly "substantial" under § 271(f)(2).  *See, e.g.*, *Grunenthal GMBH v. Alkem Lab'ys Ltd.*, 919 F.3d 1333, 1340 (Fed. Cir. 2019) (affirming a finding of no infringement even where the evidence suggested the non-infringing use would be "rare."); *Toshiba Corp. v. Imation Corp.*, 681 F.3d 1358, 1363 (Fed. Cir. 2012) (affirming a finding of substantial non-infringing use where the only non-infringing use of a device was using the accused product to record DVDs without finalizing the DVD, which meant that the recorded DVD could only be played back on the exact machine it was recorded on); *Blackbird Tech LLC v. ELB Elecs., Inc.*, No. CV 15-056-RGA, 2020 WL 5409052, at *8 (D. Del. Sept. 9, 2020) (granting summary judgment of substantial non-infringing uses based on evidence of one application of the product in a non-infringing manner: the claims required lights be connected to a wall switch and NYC's subways system used the lights without a switch).

CAP-XX has not offered any evidence showing that Maxwell's sales of electrodes were not substantial.  CAP-XX's only potential evidence comes through its expert, Dr. Zuckerbrod.  However, Dr. Zuckerbrod's shifting opinions are at odds with the evidence.  Dr. Zuckerbrod initially opined that Maxwell's electrodes "would have no other use, as they would not be suitable for batteries or electrolytic

17

capacitors." (*See* Ex. 1 (3/25/2022 Zuckerbrod Rep.), ¶ 137.) But this opinion was based on his mistaken assumption that the purchasing entity, SRI, was the "Stanford Research Institute." Dr. Zuckerbrod insisted that "SRI is the Stanford Research Institute," which "do[es] not manufacture commercial devices," and that "[t]his sale was most likely done to support a research program to develop lithium-ion capacitors." (Ex. 18 (4/25/2022 Zuckerbrod Reply Rpt.), ¶ 61.)

Even a cursory review of the available evidence (for example, reading the very first page of the cited evidence) would have shown Dr. Zuckerbrod his unfounded assumptions were incorrect. SRI is the Qingdao Sifang Rolling Stock Research Institute Co., Ltd., not the Stanford Research Institute. (*See, e.g.*, Ex. 10 (MAXWELL-CAPXX-040216) at MAXWELL-CAPXX-040217).) Maxwell's agreement with SRI expressly contemplated the manufacture of commercial devices. (*See id*. at MAXWELL-CAPXX-040217-18; *see also* Ex. 12 (2/9/2023 Bouchard Tr.) at 32:5-8 ("My understanding was that [the LCAPs made by SRI in China] went into trains.").) Dr. Zuckerbrod was not aware of these facts because he never read the SRI agreement. (*See* Ex. 4 (Zuckerbrod Tr.) at 204:5-18; *see also id*. at 201:22-204:4.) By his own admission, had he known these facts, his opinions might have completely changed. (*See id*. at 203:22-204:4.)

Now, almost a year after Dr. Zuckerbrod submitted his opinions, CAP-XX takes a different tack. In recent briefing for an unrelated motion, CAP-XX posited

for the first time that Maxwell's sales of electrodes to SRI were for "experimental" use, and therefore not "substantial."  (*See* D.I. 216 at 6-8.)  The evidence showing Maxwell's sales of electrodes for use in SRI's mass-production of commercial LCAPs belies this theory.  (*See* Section III.b., *supra*.)  Even apart from the merits, CAP-XX's newfound theory regarding experimental use under § 271(f)(2) was also never disclosed in CAP-XX's infringement contentions, discovery responses, or its expert reports.  CAP-XX has thus waived it.  *See, e.g.*, *Howmedica Osteonics Corp. v. Zimmer, Inc.*, 822 F.3d 1312, 1324 (Fed. Cir. 2016); *Pharmacyclics LLC v. Cipla Ltd.*, 2020 WL 6581643, at *2 (D. Del. Nov. 10, 2020).

### 3.  Maxwell Does Not Intend for the Electrodes to be Combined in an Infringing Manner

Section 271(f)(2) also requires that the accused infringer "***intend[]*** that such component will be combined outside the United States in a manner that would infringe the patent if such combination occurred within the United States."  *See* 35 U.S.C. § 271(f)(2) (emphasis added).  In assessing whether an accused infringer possess the requisite intent under § 271(f)(2), courts frequently consider whether: "the defendant (i) intended the combination of components to occur outside the United States, (ii) knew that the combination it intended was covered by a United States patent, and (iii) knew that the combination it intended would be infringing if it occurred in the United States."  *See, e.g.*, *Veeco Instruments Inc. v. SGL Carbon, LLC*, No. 17-CV-2217 (PKC), 2017 WL 5054711, at *22 (E.D.N.Y. Nov. 2, 2017);

19

*Whitewater W. Indus., Ltd. v. Pac. Surf Designs, Inc.*, No. 317CV01118BENBLM, 2019 WL 4452986, at *12 (S.D. Cal. Sept. 16, 2019).  The evidence of record fails to address these considerations.[7]

First, there is no evidence demonstrating that Maxwell knew a United States patent covered the accused combinations of its electrodes with the other EDLC components outside the United States.  CAP-XX has not developed any facts to indicate Maxwell's intent and CAP-XX's experts are entirely silent on this ground.  Indeed, Dr. Zuckerbrod acknowledges this requirement under § 271(f)(2).  (*See* Ex. 1 (3/25/2022 Zuckerbrod Rep.), ¶ 34; Ex. 18 (5/18/2022 Zuckerbrod Rep.), ¶ 55.)  But his opinions then fail to address the element of intent.[8]  (*See, e.g.*, Ex. 1 (3/25/2022 Zuckerbrod Rep.), §§ IX-X; Ex. 18 (5/18/2022 Zuckerbrod Rep.), ¶¶ 55-61.)

Second, there is no evidence to show that Maxwell knew the combination it intended would be infringing if performed in the United States.  CAP-XX has not

---

[7] As with CAP-XX's novel "experimental use" theory, CAP-XX's infringement contentions fail to disclose a coherent theory of infringement under §271(f), including any discussion of the requisite "intent" under § 271(f)(2).  Despite the additional discovery permitted to address this very issue, CAP-XX never amended its contentions to provide Maxwell with the particular basis for CAP-XX's theory of infringement under § 271(f).  Again, CAP-XX has waived any new arguments concerning § 271(f)(2) that were not timely raised.  *See Pharmacyclics*, 2020 WL 6581643, at *2.

[8] CAP-XX's financial expert, Mr. Pinsonneault, does not offer any infringement analysis, and where applicable, he relies on the analysis of Dr. Zuckerbrod.

identified any evidence suggesting Maxwell knew its intended combination of components would be infringing if combined domestically, and again, its experts fail to address the requisite intent under this subsection.  (*See* Ex. 1 (3/25/2022 Zuckerbrod Rep.), ¶ 34, Sections IX-X; Ex. 18 (5/18/2022 Zuckerbrod Rep.), ¶¶ 55-61.)

With no evidence indicating Maxwell intended infringement, there are no material facts to dispute.  The court should grant summary judgment that Maxwell is not liable under § 271(f).

## VI.   **CONCLUSION**

For the foregoing reasons, Maxwell respectfully requests the Court enter summary judgment that the asserted claims are not infringed under 35 U.S.C. § 271(f).

21

Dated:  March 24, 2023                    FISH & RICHARDSON P.C.


By: */s/ Grayson P. Sundermeir*
    Susan E. Morrison (#4690)
    Grayson P. Sundermeir (#6517)
    222 Delaware Avenue, 17th Floor
    Wilmington, DE 19801
    (302) 652-5070
    morrison@fr.com
    sundermeir@fr.com

    Daniel R. Gopenko
    FISH & RICHARDSON P.C.
    1000 Maine Avenue, SW
    Suite 1000
    Washington, DC 20024
    (202) 626-7745
    gopenko@fr.com

    Aamir A. Kazi
    FISH & RICHARDSON P.C.
    1180 Peachtree Street NE
    21st Floor
    Atlanta, GA 30309
    (404) 724-2811
    kazi@fr.com

    Matthew Colvin
    FISH & RICHARDSON P.C.
    1717 Main Street
    Suite 5000
    Dallas, Texas 75201
    (214) 292-4013
    colvin@fr.com

    ***Attorneys for Defendant***
    ***MAXWELL TECHNOLOGIES, INC.***

## <u>WORD LIMIT CERTIFICATION</u>

I hereby certify that the above brief conforms to the Court's Standing Order Regarding Briefing in All Cases because it contains 4,561 words, which is less than the 20 pages (5,000 word equivalent) permitted by Local Rule 7.1.3(a)(4).

*/s/Grayson P. Sundermeir*
Grayson P. Sundermeir
